ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --                      )
                                        )

Brantley Construction Services, LLC      )     ASBCA No. 61118
                                        )

Under Contract No. W912HN-10-D-0056   )

APPEARANCE FOR THE APPELLANT:        William A. Scott, Esq.
                                           Pedersen & Scott, P.C.
                                           Charleston, SC

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
                                           Engineer Chief Trial Attorney
                                           Laura J. Arnett, Esq.
                                           Allie E. Vandivier, Esq.
                                           Engineer Trial Attorneys
                                           U.S. Army Engineer District, Savannah

OPINION BY ADMINISTRATIVE JUDGE PAGE

Brantley Construction Services, LLC (BCS or appellant) entered into a contract with the United States Army Corps of Engineers, Savannah District (government or COE) to construct and replace Taxiway Juliet at Mackall Auxiliary Airfield (Mackall AAF) and Taxiway Mike at Pope Army Airfield (Pope AAF). Appellant alleges that the specifications relating to Taxiway Juliet were defective, making it impossible to perform in conformance with the contract. Appellant also alleges that it was delayed in its completion of Taxiway Mike due to issues caused by the government with Taxiway Juliet and that the government constructively changed the contract by failing to provide access to a specific batch plant site during the time of performance. The government denies the allegations, and instead asserts all issues arose due to appellant's inabilities, lack of experience, and business choices. We deny the appeal.

FINDINGS OF FACT (FOF)

*The Request for Proposal*

1. The government issued a Request for Proposal (RFP) for Task Order No. W912HN-09-C-5944, for the repair and replacement of Taxiway Juliet at Mackall AAF and Taxiway Mike at Pope AAF, to the members of the Multiple Award Task Order Contract (MATOC) pool in August 2013 (Joint Stipulation of Facts (JSF) ¶¶ 1-3; R4, tab 3

at 56-57 [1]).  BCS was a member of the MATOC pool, and submitted a bid for the work (JSF ¶¶ 2, 4).

2.  The scope of work for the Task Order called for the replacement of both failed taxiways.  This included demolishing the existing taxiways and replacing them to meet the current Unified Facilities Criteria (UFC) airfield requirements.  The new taxiways work included "plain Portland cement concrete (PCC) airfield pavement, asphalt paved shoulders, replacement of appropriate airfield directional signage, runway/taxiway illumination, taxiway markings, and appropriate erosion and sediment control devices during construction."  Taxiway Juliet was also to include permanent storm water controls. (R4, tab 3 at 57)  As explained in greater detail below, the contract allowed the contractor to determine whether it would use the slipform method or the fixed-form method of paving[2] at each of these airfields (JSF ¶ 16).

---

[1] The Board will use the Bates-labeling to identify page numbers for any Rule 4 documents, unless otherwise noted.  References to transcripts specify the volume and page number affixed by the court reporter, unless these are evidentiary depositions that have been admitted as part of the Rule 4 file.

[2] We distinguish between "ready mix" or "ready mixed" concrete, "Ready Mix Company," and "Ready Mix Concrete."  "Ready Mixed Concrete Company" (sometimes called "Ready Mix Company") is the brand name of a commercial enterprise that furnishes ready-mixed concrete.  Lower case references to "ready mix" or "ready-mixed" are to a type of concrete which, under the terms of this contract and as explained by testimony, is mixed *en route* and transported to the placement site in an agitating truck (*see, e.g.*, R4, tab 3 at 826; tr. 1/54-55, 57, 2/15).  However, the distinction between the product and the company was not always strictly followed and the proprietary term is sometimes used in the vernacular.  For example, T.C.P. Concrete Construction's (TCP) representative clarified that the "Ready Mix" concrete in that company's post-award bid to BCS was actually "ready mixed concrete" that it would have obtained from Concrete Services (*see, e.g.*, R4, tab 45 at 225).  Sometimes, the agitating trucks that carried the concrete in rotating drums were referred to as "ready mix trucks" even though it was not clear these belonged to the Ready Mixed Concrete Company (*see, e.g.*, R4, tab 11 at 1204 and tab 30 at 3057-58).  In similar fashion and as can be seen throughout the findings and decision, the paving method "slipform" is sometimes called "slip form" and the fixed-form paving method is also called "fixed form," and "haul time" is "Haultime."

3. The Taxiway Juliet contract required replacement of the entire taxiway, approximately 480 feet (tr. 1/46[3]). The contract defined the site by a red line surrounding the specific area where the work was to be performed (R4, tab 4 at 949; tr. 1/45). There are no gates or fences restricting access to Mackall AAF (tr. 1/42-43, 2/177, 4/82; R4, tab 44 at 93).

4. The Taxiway Mike contract required the replacement of the current taxiway, as well as the installation of a 60-inch storm drain under the taxiway (tr. 1/49-50). There is a gate restricting access to Pope AAF and a pass is required for those who enter the facility (tr. 1/47-48).

5. Prior to the issuance of the solicitation, the government completed a biddability, constructability, operability, and environmental review certification, which found that the "project is ready for advertisement and award" (R4, tab 93 at 907-08, ex. 54).

6. Numbered paragraph 4 of the RFP states that "[i]f an Offeror believes the requirements in this RFP contain an error, omission, or are otherwise unsound; the Offeror shall immediately notify the Contracting Officer in writing, to include supporting rationale" (R4, tab 3 at 57). BCS did not contact the contracting officer (CO) regarding any potential errors, omissions, or issues with the RFP requirements prior to submitting its bid (tr. 4/197; *see generally* tr. 2/205-19).

*Requirements in the RFP and Contract for the Slipform Paving Method and the Fixed-Form Paving Method*

7. The RFP includes contract specification § 32 13 11, which states the requirements for concrete pavement for airfields and other heavy-duty pavements (JSF ¶ 8 citing R4, tab 3 at 377-437, 795-855). This specification lays out stringent requirements for the concrete to be used in paving Taxiway Juliet and Taxiway Mike, and professional qualifications for the concrete specialists used by the contractor (R4, tab 3 at 795-855). For example, the contractor would be paid only for concrete that met certain tolerances, and was made and placed in accordance with technical publications as referenced (*see, e.g.*, *id*. at 795- 814, § 32 13 11, ¶¶ 1.1-1.6, including requirements for surface smoothness, edge slump and joint face deformation, plan grade, flexural strength, thickness, and diamond grinding of PCC surfaces). The contractor was held to quality control (QC) standards at § 32 13 11, ¶ 1.5 Quality Assurance (QA) (*id*. at 810-14), which included at ¶ 1.5.1 verifying to the CO that its QC staff, including the "petrographer, surveyor, concrete batch plant operator, and profilograph operator" were

_____

[3] Although the transcript refers to Taxiway Mike, when the testimony is placed in context this was erroneous, and the testimony about approximate length was for Taxiway Juliet.

3

"American Concrete Institute (ACI) Certified" at specific levels; at ¶1.5.2 that its "other staff" were suitably trained; and at ¶1.5.3 that the laboratory and testing facilities used by the contractor were accredited (*id*. at 810-11).

8. Specification § 32 13 11, ¶ 1.5.6, Test Section, requires the contractor to "construct a test section as part of the production paving area" that would demonstrate to the CO in a satisfactory manner "the proposed techniques of mixing, hauling, placing, consolidating, finishing, curing, initial saw cutting, start-up procedures, testing methods, plant operations, and the preparation of the construction joints" at least 10 days prior to the start of concrete placement. The test section must meet all specification requirements and be acceptable to the CO. If it is not acceptable, the contractor is required to remove the failed test section at its own expense and construct "additional test sections at no additional cost to the Government." If the contractor wanted to use slipform paving but failed to place an acceptable test section, the contractor is required to remove the slipform paving equipment and complete the work using the fixed-form method. The contractor is not allowed to begin production paving "until the results on aggregates and concrete, including evaluation of the cores, and all pavement measurements … have been submitted and approved by the Contracting Officer." (R4, tab 3 at 394, 812)

9. The contract specifies the means of concrete placement for both taxiways (JSF ¶ 16; tr. 2/140-42). The contract allows the contractor to determine whether it will use the fixed-form method or the slipform method of placement at each of the two project sites. Specifically, specification § 32 12 11. ¶ 3.5.1, Paving General Requirements, states "[p]avement shall be constructed with paving and finishing equipment utilizing rigid fixed forms or by use of slipform paving equipment." (JSF ¶ 16 citing R4, tab 3 at 836) Government expert witness Dr. Raymond S. Rollings[4] said that he "saw nothing that would indicate that there was any problem executing either slip form or [fixed-] form construction of an airfield pavement under those specifications" as these "were of the normal type [used] . . . worldwide" (tr. 4/135). Depending upon which of these two paving methods the contractor decided to use, it had to comply with differing procedures that affected the formulation of the concrete, the timing and sequence of operations, the manner and place of mixing the concrete including "charging" it by adding water, the type of vehicle used to transport the concrete to the site, and the equipment used to place the concrete at the paving site (*see, e.g*., R4, tab 3 at 795-855; tr. 1/135).

_____

[4] Appellant moved to exclude Dr. Rollings as an expert witness (app. br. at 30-31; tr. 4/122). We note that BCS stipulated during the hearing that it did not object to Dr. Rollings as "an expert in concrete placement under the specifications" for runways, but did object to his "defining haul time or some of the other issues" (tr. 4/124). We find that the government established Dr. Rollings's credentials as an expert (*see, e.g*., *Lebolo Watts Constructors 01 JV* (*LWJV* II), ASBCA No. 59740 *et al*., slip op. at 64-66), and deny the motion.

10.  As contemplated by this contract, fixed-form placement involves the use of ready-mixed concrete hauled in mixer (agitating) trucks.  The concrete was to be deposited between forms ("rails"), which hold the concrete in place while it sets up.  As part of the fixed-form method, a finishing machine rides on top of a fixed rail.  The concrete is placed in front of the machine, which finishes the concrete as it moves down the side rails.  (Tr. 1/54-56; app. supp. R4, tab 82 at 247)

11.  For the fixed-form method, specification § 32 13 11, ¶ 3.4, Concrete Production, states, "[ready mixed c]oncrete transported in truck mixers shall be deposited in front of the paver within 90 minutes from the time cement has been charged into the mixer drum of the plant or truck mixer" (JSF ¶ 17 citing R4, tab 3 at 835).  The COE monitored the 90-minute placement time for fixed-form placement (R4, tab 44 at 51; tr. 4/187, 200-01).  Ready-mixed concrete that exceeded the 90-minute placement time was not supposed to be used on the project (tr. 2/24).

12.  In contrast, the slipform method involves placement of concrete mixed in a central or stationary batch plant ("batch concrete") that is transported in non-agitating dump trucks (R4, tab 3 at 822-28, § 2.10 Equipment).  In slipform paving, the paver spreads, consolidates, and finishes the concrete with one pass of a single machine.  No forms are used to support the concrete edges, and the concrete mixture must have sufficient cohesion and stiffness to stand unsupported behind the paver without slumping or bulging.  (Tr. 1/52-55; app. supp. R4, tab 92, tab 46 at 14)

13.  For the slipform method, the specifications provide:

> a.  Specification § 32 13 11. ¶ 2.10.3, Transporting Equipment, states, "Slipform concrete shall be transported to the paving site in nonagitating equipment conforming to ASTM C94/C94M or in approved agitators."

> b.  Specification § 32 13 11, ¶ 2.10.2, Concrete Mixers, subpara. e, Truck, indicates, "Truck mixers shall not be used for mixing or transporting slip formed paving concrete."

> c.  Specification § 32 13 11, ¶ 3.4, Concrete Production, states, "Concrete transported in non-agitating equipment shall be deposited in front of the paver within 45 minutes from the time cement has been charged into the mixing drum, except that if the ambient temperature is above 90 degrees F, the time shall be reduced to 30 minutes."

d. Specification § 32 13 11, ¶ 3.4.2, Transporting and Transfer, states, "Non-agitating equipment shall be used only on smooth roads and for haul time less than 15 minutes. Concrete shall be deposited as close as possible to its final position in the paving lane."

(JSF ¶ 18 citing R4, tab 3 at 825-26, 835-36)

14. The original contract required that the concrete used with the slipform method had to be delivered in non-agitating trucks (tr. 1/54-55). The effect of contract specification § 32 13 11, ¶ 2.10.2 Concrete Mixers, subparagraph e, which limited the use of certain trucks to mix or transport concrete used for slipform paving (R4, tab 3 at 825) was that the contract did not allow ready mixed concrete to be used for slipform paving.

15. Specification § 32 13 11, ¶ 3.4, Concrete Production, also requires the following:

> Every load of concrete delivered to the paving site shall be accompanied by a batch ticket from the operator of the batching plant. Tickets shall be on approved forms and . . . . shall be delivered to the placing foreman who shall keep them on file and deliver them to the Government weekly, or as directed by the Contracting Officer.

(R4, tab 3 at 417)

16. The contractor was also supposed to monitor the 45-minute window for batch concrete used for slipform placement (tr. 4/62-63, 78, 187). Consistent with specification § 32 13 11, ¶ 3.4 (R4, tab 3 at 835-36), the 45-minute placement window started when the cement was charged into the mixing drum and ended when the concrete was deposited in front of the paver (tr. 4/57-58, 169). The COE Chief of Construction indicated that the COE enforces "the actual execution of it" but explained, "[t]here's not a stopwatch on the trucks" (tr. 4/200). The batch concrete called for in slipform paving that exceeded the 45-minute placement window should have been rejected (tr. 4/63, 75, 78, 172).

17. Specification § 32 13 11, ¶ 2.10, Equipment, required BCS to submit the following:

> a. Details and data on the batching and mixing plant prior to plant assembly. . . .

6

b. . . . (NRMCA)[5] certification of the concrete plant. . . .

c. A description of equipment proposed for transporting concrete mixture. . . .

d. A description of equipment proposed for machine and hand placing. . . .

(R4, tab 3 at 822-23)

*Batch Plant Requirements and Bidder Inquiry Regarding Siting at Taxiway Mike*

18. Specification § 32 13 11, ¶ 2.10.1, Batching and Mixing Plant, provided information regarding the location, type, capacity, and tolerances for the batching and mixing plant (JSF ¶ 10 citing R4, tab 3 at 823).

19. For Taxiway Juliet, specification § 32 13 11, ¶ 2.10.1, Batching and Mixing Plant, provided that "[t]he batching and mixing plant shall be located off Government premises no more than fifteen minutes haul time from the placing site" (JSF ¶ 11 citing R4, tab 3 at 823). Additionally, "[t]here are no disposal, borrow, or pavement batching facilities at [Mackall AAF]. Contractor is responsible for identifying and utilizing local (offsite) disposal, borrow, and pavement batching facilities in accordance with the specifications" (JSF ¶ 12 citing R4, tab 4 at 938). Taxiway Juliet Contract Drawing GI102 required that haul routes and pavement batching facilities be approved by the CO's representative (COR) and coordinated with the airfield manager. The contract also required that the location of the batch plant area be "coordinated with the contracting officer." (R4, tab 4 at 938-39)

20. Taxiway Mike Contract Drawing CS100 states, "[c]ontractor shall utilize site designated on this sheet for the batch plant and crushing operations." The drawing identifies both an existing crusher site and a batch plant. (JSF ¶ 13 citing R4, tab 4 at 912)

21. Another offeror inquired about the existing batch plant near the Taxiway Mike project site in bidder inquiry 5329272 (JSF ¶ 14). Prior to the bid, the COE responded:

> The batch plan[t] shown is the current batch plant being used for Blue Ramp. This and the crusher site were shown so that the Contractor would know where these operations <u>can be</u>

---

[5] "NRMCA" is an acronym for the "National Ready Mixed Concrete Association" (R4, tab 3 at 804).

located.  It should be assumed that when the current Contractor constructing Blue Ramp is finished, he will remove his batch plant.

(JSF ¶ 15) (emphasis added)  The COE response did not specify when the Blue Ramp project would be finished (R4, tab 8 at 1181).

22.  Taxiway Mike Contract Drawing GI102 indicated that the staging, laydown, and batch plant areas were "to be determined by the airfield manager and coordinated with the contracting officer" (R4, tab 4 at 905).

*Lack of Pre-Bid Site Investigation and Related Bidder Inquiry*

23.  The contract included FAR Clause 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984).  The pertinent parts of the Site Investigation and Conditions Clause state:

> (a)  The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to
>
>> (1)  conditions bearing upon transportation, disposal, handling, and storage of materials;
>>
>> (2)  the availability of labor … and roads;
>>
>> …
>>
>> and (5)  the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site … as well as from the drawings and specifications made a part of this contract.  Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of

successfully performing the work, or for proceeding to
successfully perform the work without additional
expense to the Government.

(b)  The Government assumes no responsibility for any
conclusions or interpretations made by the Contractor based
on the information made available by the Government.

(JSF ¶ 6 citing R4, tab 5 at 1088-89)

24.  Prior to the bid submittals, another bidder inquired whether a site visit was going to be scheduled.  The COE responded, "[t]here will be no scheduled site visit due to this being a full-design project."  (JSF ¶ 7)  Brantley did not visit the sites before submitting its bid nor did it request to do so (tr. 2/12-13, 215, 3/16).

25.  BCS presented no evidence that anyone involved in the project, whether it was its own employees or prospective subcontractors and suppliers, looked into, let alone drove, the possible routes to Taxiway Juliet at Mackall AAF prior to bid or checked into the time it would take to haul concrete and materials (tr. 3/17-18; R4, tab 44 at 84).  When asked at the hearing if he would have considered the haul time if he had performed a site investigation, BCS founder and estimator, Mr. Sidney A. Brantley, testified:

I would never have thought about that back then . . . .  But
back then that never even came across our radar.  We weren't
even thinking about that.  That was something ain't even
crossed our minds about the time being an issue on this thing.

(Tr. 2/192-93, 224)

*BCS's Prior Airfield Paving Experience*

26.  Prior to this Project, BCS did not have experience with the slipform method of concrete placement (tr. 3/19-20).  BCS's previous experience with airfield paving included 2-3 projects performed 20 to 25 years before that used the fixed-form method of placement (tr. 2/195, 3/19).

*BCS's Estimate and Bid*

27.  Despite testimony that Mr. Brantley prior to bid never intended for BCS to self-perform the work on this project but planned to subcontract it out (tr. 2/205), he said that he prepared an estimate for appellant to do the work using the fixed-form method. When questioned at hearing, Mr. Brantley testified that although he did not want BCS to

9

self-perform, "it would have been on the rail rider method with fixed forms" if it had to do so. (Tr. 3/20-21) He agreed that there had been no need for him to include a portable batch plant in his estimate for Taxiway Mike, because one would not be necessary to pave using the fixed-form method (tr. 3/28-29). Mr. Brantley estimated a cost of $597,552 for Taxiway Juliet and $707,308 for Taxiway Mike. Mr. Brantley indicated that the paver rental was "a major expense that has to go in there" and if it had been included, the cost would have been "a much higher number" than reflected in his estimate (tr. 3/27-28, 46-48).

28. In preparation for presenting its bid, BCS requested proposals from prospective concrete subcontractors (R4, tab 49 at 319[6], 330). One proposal from Ready Mixed Concrete Co. provided a rate for ready mix supply concrete for "Taxiway Mike Only" (R4, tab 56 at 479). Another proposal by Triangle Grading and Paving (Triangle) proposed $551,046.09 for concrete paving at Taxiway Juliet and $883,823.55 for concrete paving at Taxiway Mike. Triangle's written quote did not indicate what method of concrete placement it was proposing or the type or source of the concrete. (R4, tab 49 at 336, tab 56 at 483-86)

29. At the hearing, Mr. Brantley testified he did not really look into Triangle's bid, because "[a]t the time of the bid, I think I may have just glanced at it, but I did not really go into great detail because … they were not low" (tr. 3/34-35).

30. There is a dispute over whether TCP Concrete Construction (TCP) provided a telephonic quote to appellant before BCS submitted its bid. Although TCP's estimator Mr. Robert Lawhorn agrees that he spoke with BCS prior to the bid, he said that his company declined to participate at that time and denied verbally giving unit prices to BCS. (Tr. 2/219-23, 3/51; *compare* R4, tab 45 at 202-03, 210, 212-23, 253-55, 266) Although Mr. Brantley identified the BCS pre-construction services estimator who "took the quote" from TCP prior to bid as Ms. Christina McAlhaney (tr. 2/206-07, 3/7, 3/37-40), she did not testify at the hearing, nor did appellant provide any deposition, declaration, or affidavit from her to support her participation in or view of the call. Interestingly, despite having a form for taking telephonic quotes, BCS did not use that form to write down TCP's alleged quote (tr. 3/39; R4, tab 41 at 10). Even though TCP denied providing a quote prior to BCS's bid submission to the government (giving multiple reasons the Board finds credible), Mr. Brantley testified that he took the unit prices from the alleged TCP quote and "expanded it out" based upon quantities that he had obtained from take-offs prepared at his request by Ms. McAlhaney (tr. 2/205-07,

---

[6] The page number indicated is from the COE-affixed Bates label at the top right corner of each page. When two sets of Bates labels exist, the Board uses the Bates label that begins with COE, generally located at the top right corner, although it is occasionally located on the bottom right corner of a page.

231).  Mr. Brantley testified that he believed the Triangle bid and alleged TCP bid "took place the morning of the bid" (tr. 3/41).

31.  Based on the evidence presented, the Board does not find that appellant has proven that TCP provided a telephonic proposal before BCS submitted its bid. Mr. Lawhorn, the estimator from TCP, testified that he had a post-award conversation with Mr. Brantley where he asked Mr. Brantley whose number BCS used to bid the project and Mr. Brantley responded, "I used my number, it's just concrete."  Mr. Lawhorn indicated he felt Mr. Brantley's characterization was "really over-simplification.  PCC concrete is not just concrete.  It takes specialized equipment.  It takes a knowledgeable workforce."  (R4, tab 45 at 230)  Additionally, as discussed below in finding of fact (FOF) 39, after contract award, BCS sent a post-award email to TCP, requesting a bid.

32.  According to appellant, on the day of its bid to the government, BCS had three estimates, including two from potential subcontractors and one developed in-house.  These were (1) a written proposal from Triangle that did not indicate the method of concrete placement that would be used or if the concrete would come from a batch plant or elsewhere (*see* FOF 28); (2) handwritten notes purportedly representing figures from a telephone call with TCP which Mr. Brantley had expanded into amounts for both Taxiway Juliet and Taxiway Mike (*see* FOF 30); and (3) Mr. Brantley's estimate for BCS to perform fixed-form placement which omitted costs for paver equipment, a petrographer, a foreman, overhead, and markup (tr. 3/20-21, 27-30, 46-47; R4, tab 41 at 8-9).

33.  Mr. Brantley testified that he made the decision to use the unit prices from the alleged TCP telephonic quote in BCS's bid for the project (tr. 3/43-44).  Mr. Brantley used his "low number" of $715,000 for Taxiway Mike and $513,746 for Taxiway Juliet (tr. 3/46-48).

34.  Mr. Brantley also testified that he did not know what paving method TCP's alleged quote was for but that he assumed it was slipform.  He was not concerned about where the concrete was going to come from or where the batch plant would be located because he "didn't know the facts as to how they were delivering their concrete." (Tr. 2/45, 3/44-45)  As we found above, we do not believe that BCS has shown that TCP provided a quote to use the slipform method (or any other method) to BCS before the latter's bid was submitted to the government for this project.

35.  There is no evidence that any of BCS's figures on bid day included costs for a batch plant, as required for slipform placement, despite Mr. Brantley's testimony he thought the proposal he had received from TCP was for slipform placement and did not know what method Triangle intended (tr. 3/27-30, 34-36, 44-47; R4, tab 56 at 483-86, tab 41 at 8-10).

11

36. Despite his testimony that prospective subcontractors submitting bids to BCS were going to perform slipform paving, the evidence does not show any pre-bid proposals for slipform placement. Instead, it shows Mr. Brantley did not know how the concrete would be delivered, what type of paving any alleged subcontractors would do, whether time limits would be met, or what type of concrete would be used. Furthermore, TCP's estimator testified that the company did not provide a pre-bid estimate at all, let alone one for slipform placement. We find there is no credible evidence that BCS, or the subcontractor whose figures BCS allegedly used in coming up with its pricing, relied during the pre-bid stage on the slipform method specifications.

37. On September 4, 2013, BCS submitted its bid for the project to the COE (R4, tab 6).

*Contract Award*

38. On September 26, 2013, Contract No. W912HN-10-D-0056, Task Order 0008 to BCS in the overall amount of $3,406,100 became effective between the COE and BCS. The contract duration was 270 calendar days. (JSF ¶ 5) According to Contract Line Item (CLIN) No. 0002, the work at Taxiway Mike was in the lump sum of $1,898,600 and the work at Taxiway Juliet was in the lump sum of $1,507,500 (R4, tab 7 at 1166).

*BCS's Post-Award Efforts to Obtain Concrete Subcontractor(s)*

39. On September 27, 2013, one day after the contract became effective, BCS sent an email to the estimator at TCP requesting a proposal. The email included a link to the contract specifications and said, "[t]hanks for taking a look at this again!" (App. supp. R4, tab 62)

40. When asked why BCS sent him the link to the plans and specifications the day after award, Mr. Lawhorn testified, "[BCS] received the award and [TCP] did not bid the project on the – on the bid side of it, and we were asked to take a look at it now that they had the project" (R4, tab 45 at 220). When asked what he did after receiving the email, Mr. Lawhorn testified that he "did an estimate for the scope of work that I put into my proposals. . . " (*id.* at 222).

41. By email dated October 11, 2013, an assistant project manager at BCS asked another prospective subcontractor, JD Contractors, LLC, for a lower quote, stating "Is that the lowest you can go with your numbers? It's a little bit high for what we have in the bid with our own numbers." The project manager indicated that BCS's budget was "around $700,000 on Mike, and $500,000 on Juliet." (R4, tab 49 at 344) (emphasis added) Of note, the emails indicate that its bid was done with BCS's own numbers, not those of a subcontractor it thought it would be working with.

12

42. Between October 25, 2013 and November 8, 2013, three prospective subcontractors (McCarthy Improvement Company (McCarthy), Certified Concrete Construction, and TCP) submitted post-award quotes to BCS for the airfield paving scope of work at both taxiways (*see* R4, tabs 11, 49, and 57). All indicated that their quotes were made working under the assumption they could use ready mix concrete for slipform placement. McCarthy's quote specifically stated, "[t]he prices above are based on concrete delivered in Ready Mix Trucks. The prime contractro [sic] will be responsible for having the specifications change [sic] to allow for delivery of concrete in Ready Mix Trucks for slip form paving" (R4, tab 11 at 1204). Certified Concrete Construction's quote indicated that a central batch plant is not available for the area and that its price is "based on the assumption that we will be able to use Ready Mixed Concrete who has a dry batch plant using truck mixers" (R4, tab 49 at 356). TCP's initial post-award quote was to perform demolition and slipform placement with ready mix trucks and "require[d] the work be awarded with no phasing considerations" (tr. 3/9; R4, tab 45 at 223-25, tab 57 at 491). Three days later, TCP provided a revised quote for demolition and slipform placement with ready mix trucks, which also included "panel removal/ replacement at Arm/De-Arm Pad" and a 6 inch drainage layer (tr. 3/9; R4, tab 57 at 493).

43. Mr. Brantley asked TCP to break out its proposal and remove demolition from the scope of the work, but TCP did not want to do the paving by itself (tr. 3/10; R4, tab 45 at 216-17, 224-25, 230). Mr. Brantley told Mr. Lawhorn that TCP's proposal was not "within his budget." When Mr. Lawhorn asked whose numbers BCS used for its bid, Mr. Brantley said, "I used my number." (R4, tab 45 at 230)

44. None of the subcontractor or supplier proposals obtained by BCS after award proposed slipform placement using batch concrete delivered in dump trucks from a portable batch plant (R4, tab 11 at 1202-04, tab 45 at 208, 237-38, tab 49 at 356, tab 57).

45. Mr. Brantley admitted that, prior to bid, he was unaware of the requirement for a 15-minute haul time for slipform placement (tr. 3/17). Specifically, he testified, "It wasn't even on my radar. I never even thought about it." When questioned at trial regarding what he "could have done to have avoided the problem either in the pre-bid process or after award, he suggested that "had [the government] put in their specs [that haul time is critical … we would have probably gone out there and timed it." (Tr. 3/14, 19)

46. After receiving TCP's proposal, Mr. Brantley spoke with an employee at Ready Mixed Concrete Co. about paving, and she raised an issue regarding haul time. Mr. Brantley testified that this was the first time that he learned about the haul time limitation and the possibility it could present a problem. (Tr. 3/11-12)

47. Mr. Raphael Maher, vice president and senior project manager for BCS, became involved with the project in the middle of November of 2013 (tr. 1/26, 57-58); this was about two months after BCS was awarded the contract (*see* FOF 38). Mr. Maher explained that when he started working on the project, BCS "had been in contact with Ready Mix[ed] Concrete [Co.] to see about getting a ready-mix concrete approved to use McCarthy as our subcontractor to do the job" (tr. 1/81). Specifically, Mr. Brantley told Mr. Maher that BCS planned to work "with McCarthy and that we were looking at using a ready-mix concrete with slip form" (tr. 2/14).

48. Mr. Maher testified that the project was "handed off" to him by Mr. Brantley, and at the time that happened, Mr. Brantley "knew that he could not . . . meet the 15-minute haul time and could not . . . place a [batch] plant on site" (tr. 2/27). Mr. Maher also testified that the contract did not impose restrictions on which taxiway had to be completed first, but did require that Taxiway Mike be completed in such a manner as to minimize impact on operations there. BCS decided to begin work at Taxiway Juliet, and once the concrete work was completed there to move to Taxiway Mike for that purpose. (Tr. 1/60-61; R4, tab 64 at 150-51; *see also* app. br. ¶¶ 63-64 at 9).

49. Ready Mixed Concrete Co. produces ready-mix concrete that is hauled in agitating trucks, which are not limited by the contract to a 15 minute haul time (tr. 2/15; R4, tab 3 at 417, 835). On November 21, 2013, Ready Mixed Concrete Co. submitted a proposal to BCS stating that it wanted to use ready mix concrete with slipform placement. As part of the proposal, Ready Mixed Concrete Co. proposed shipping the concrete from its plant 45 miles from Taxiway Juliet and 13 miles from Taxiway Mike. Due to the distance of the shipping, Ready Mixed Concrete Co. also proposed having the haul time in the contract changed to 90 minutes. (R4, tab 13 at 1247)

50. Nowhere in the proposal or subsequent correspondence did Ready Mixed Concrete Co. attempt or even discuss the possibility of setting up a portable batch plant. The Board finds that Ready Mixed Concrete Co. had an issue with the haul time not because it tried to follow the specifications laid out in the contract, but because it proposed to haul concrete from its existing plant 45 miles away to supply Taxiway Juliet. (R4, tab 13 at 1247)

51. On November 25, 2013, BCS consultant Mr. Randolph Marshall sent an email to the COE on behalf of BCS indicating that BCS had retained him to help with the project. Mr. Marshall listed issues he wanted to "discuss and resolve" including the use of "[a] slip form paver and some hand set forms" as well as BCS's "plan to use ready-mix concreted (sic) that is batched off site." (R4, tab 12)

52. By correspondence dated November 25, 2013, BCS sent a subcontract agreement to McCarthy, which incorporated the October 25, 2013 proposal from

McCarthy to perform slipform placement using ready mix trucks but with updated pricing (R4, tab 11 at 1186-1217).

53. On November 26, 2013, Mr. Maher and Mr. Marshall exchanged emails regarding a draft letter to the COE. In the exchange, Mr. Marshall stated, "I think our biggest deviation request would be [to] allow truck mixers to be [sic] to supply slip machines." Mr. Maher responded that they should "address a variance for the truck mixers with the slip forms because the plant cannot be located on Gov't property [sic] per spec." (R4, tab 49 at 368)

54. Over the course of the next month, Mr. Marshall and Mr. Maher emailed various people who were not the CO or COR for the contract. They indicated the contractor was going to need a deviation from the specifications. (*See* R4, tab 13 at 1219-20, tabs 12, 14, 49 at 368; app supp. R4, tab 63 at 147-48).

55. On December 13, 2013, Mr. Maher sent an email to Ready Mixed Concrete Co., asking if it could provide portable batch plants: "if we cannot get [the deviation] approved, can your company provided [sic] an onsite central mixing plants?" Ready Mixed Concrete Co. responded that it did

> [N]ot have a Central Mix Plant available to place on these job sites nor do we have any of the paving mixers with in our fleet. If what we have proposed does not get approved we regretfully could not supply these two projects. At that point I would recommend using a turn key paving contractor like a McCarthy Improvement. They could provide the plant, the trucks, and the finishing.

(R4, tab 49 at 373)

*The Notice to Proceed*

56. The Notice to Proceed (NTP) was issued on December 13, 2013, with a stated contract duration of 270 calendar days (R4, tab 15). The original contract completion date would have been September 9, 2014.

*BCS's Continued Post-Award Search for Concrete Subcontractors and Request to Deviate from Paving Specifications*

57. On December 23, 2013, Mr. Maher had an email exchange with McCarthy, Mr. Marshall, and Ready Mixed Concrete Co. Mr. Maher later testified he was "looking for anywhere I could find [a portable batch plant] that was available," almost two weeks

15

after the NTP was issued.  (Tr. 2/36-37)  In its emails, McCarthy stated that it did "have a very portable, low profile central batch plant but it is tied up virtually all of next year" (R4, tab 49 at 383).  McCarthy continued, indicating that there was obvious confusion about the project parameters:

> Based on multiple conversations I have had with your coworkers, I think it is safe to say there has been some confusion as to what is specified versus "doable" on this one and the military's specs need to override anything you might have picked up from other possible concrete subs.  Sid [Brantley] and Evan [Meece] have conveyed to me various comments from these other subs and I have gotten the impression their "concerns" might be driven more by their own limitations versus the true specs ….  Please allow me to reiterate our desire to do your work, if the [ready mix] trucks can be changed.  Otherwise, I am afraid you are in a pickle finding a way to justify the cost of a central batch plant.

(R4, tab 49 at 382)

58.  BCS submitted RFI-0004 on December 23, 2013, requesting:

> to use a slip form machine with ready mix trucks since the contract documents restrict the contractor from placing a concrete plant on site and the batch plant dump trucks must drop their concrete in placed with in [sic] 15 min.  The ready mix trucks would allow 90 minutes for placement.  It would not be possible to get a dump truck from an offsite plants [sic] within 15 minutes given the base configuration of the Post.  Again our sub and concreteplants [sic] have used these ready mix trucks / slip forms on many concrete jobs on the Post and have had expellant [sic] results and high quality work.

(R4, tab 18 at 2)

59.  The COE responded to RFI-0004 by correspondence dated January 6, 2014 in which it denied the variance request to use ready mix trucks.  The COE indicated, "Request has been reviewed and will not be granted.  When using slip form with readymix trucks, historically the Government has experienced lower quality airfield pavement wich [sic] is why the specs will not be changed.  Specifications must be complied with."  (JSF ¶ 21; R4, tab 18 at 2)

*BCS's Unsuccessful Attempt to Self-Perform the Paving and Contract Modification 1A*

60. After the request for a deviation was denied, BCS decided to hire "a paving machine manufacturer to bring in a paving machine and we hired a subcontractor – a finishing company behind him to perform the work" (tr. 1/100). As part of that plan, on February 20, 2014, BCS entered into an agreement with Heavy Equipment Manufacturing (HEM) to provide a "fixed form concrete paving machine complete with operator and ground man for a complete concrete construction job for the repair/replacement of two concrete taxiways . . . ." (R4, tab 21).

61. Starting in July 2014, BCS attempted placing test lanes at Taxiway Juliet using the fixed-form method. The placements failed due to poor quality and safety issues. (R4, tab 24 at 1985, 1997-98, 2005, tab 25 at 2582) Mr. Maher admitted during the hearing that BCS "failed miserably" at the fixed-form method (tr. 1/99-100).

62. Bilateral contract Modification 1A was executed by the government on August 5, 2014. The modification, which contained a release of all claims by the contractor, extended the performance by 264 calendar days and set two alternative periods of time for BCS to place concrete at Taxiway Mike. That work could "only occur between the months of April thru May or September thru October" 2015 since the work for Phase 1 of the project "requires a waiver submittal to the FAA to displace the runway during the construction." (R4, tab 16 at 152-156) The modified contract required BCS to complete Phase 1 before starting work on Phase 2, since the Phase 1 work area would no longer be accessible once work began on Phase 2 under the Taxiway Mike phasing plan (R4, tab 4 at 907, phasing note 3).

63. On August 7, 2014, the COE issued a Letter of Concern, expressing apprehension that BCS was behind schedule and had not successfully placed a test lane at Taxiway Juliet. The COE requested that BCS submit a recovery schedule. (JSF ¶ 22; R4, tab 26) This letter reminded BCS that the initial phase of the work was for it to complete the test lane at Taxiway Juliet but had failed on July 10, 2014 and while its second attempt of July 22 & 23, 2014 was being evaluated it was unlikely that this test lane would be successful either. The government noted that the work there was to be suspended by September 1, 2014, until "winter has passed." BCS was reminded that "all concrete placement at Taxiway Juliet was to be completed by July 23, 2014; and without a significant increase in your rate of progress you will fail to meet the milestone completion for Taxiway Juliet as well as the overall contract completion date of June 1, 2015." (R4, tab 26)

64. By correspondence dated August 21, 2014, BCS responded to the Letter of Concern, stating that the failed test lanes were "primarily impacted by equipment failures

beyond our control" (R4, tab 27 at 3049). On September 4, 2014, BCS submitted its recovery plan (R4, tab 28).

65. On October 24, 2014, the CO issued a Cure Notice, and notified BCS that its lack of progress was endangering performance of the contract (JSF ¶ 23; R4, tab 29).

66. In response to the Cure Notice, BCS stated in correspondence dated October 27, 2014 that it bid with the intent to deviate from the contract by using slipform placement with ready-mix trucks. Specifically, BCS said it

> [C]ontemplated the use of a specialty subcontractor to pour the concrete taxiways with the use of a slip form machine and ready-mix trucks. <u>BCC's decision to bid the Project using such a method was reasonable where it was otherwise impossible to comply with the conflicting Specifications based on the configuration of the AAF and the proximity of the Project to the AAF's front gate.</u>

(R4, tab 30 at 3057-58) (emphasis added) Although Mr. Maher said at trial the inclusion of the language indicating BCS's intent to have a subcontractor perform slipform paving using ready mix concrete when it bid the project was an error, we find that testimony self-serving and suspect, given the weight of the other evidence (tr. 1/125-26). Notably, this letter, more than one year after award of the contract, was the first time BCS alleged in writing to the COE that it was "impossible" to meet the contract requirements. As part of its letter, BCS requested the COE grant multiple deviations from the contract, which it believed would fix the problems encountered. (R4, tab 30)

67. On October 28, 2014, the COE and BCS met to discuss the project and BCS's plan to complete the work (JSF ¶ 24).

68. BCS submitted a letter to the COE on October 31, 2014, again responding to the Cure Notice and requesting a variance to "use slip form paving machine and ready-mix trucks for the remaining pours necessary to complete the Project." BCS indicated that it "intends to retain McCarthy Improvement . . . or another equally experienced specialty, slip form concrete paving subcontractor, to complete the remaining concrete paving on the Project." BCS stated "[u]sing McCarthy is our preferred plan as it is well-respected and highly experienced in the performance of the exact work and methods to be employed, and is available for immediate mobilization." BCS also renewed its request to "grind existing concrete in excess of percentages set forth in Specifications" because "the current Rail Rider HEM machine will not produce the required results needed for the contract specified smoothness tests." (JSF ¶ 25; R4, tab 31).

18

69. On October 30, 2014, McCarthy sent BCS an email, stating that it had not originally priced the project based on the contract specifications, and, as such, it was increasing its proposed pricing (R4, tab 49 at 458).

*BCS's Request for a Variance to Use Ready-Mixed Concrete to Perform Slipform Paving Is Granted*

70. On November 13, 2014, the CO granted BCS's request for a contract variance to use ready mix trucks with the slipform paving method "at [BCS's] own risk." The COE expressed concerns about BCS's ability to continuously supply concrete using ready mix trucks with the slipform paving method. (JSF ¶ 26; R4, tab 32)

*BCS Subcontracts with McCarthy for Slipform Paving at Taxiway Juliet*

71. On or about November 26, 2014, BCS and McCarthy executed a subcontract to perform slipform paving at Taxiway Juliet (JSF ¶ 27; R4, tab 33) and the project began to move forward. On December 5, 2014, the CO sent BCS a letter captioned "Response to Request for Constructive Change Modification." He acknowledged informal discussions regarding possible changes, but stated that these were "not . . . issued as a directive to change the requirements of the contract," which "remain unchanged and [BCS] shall proceed until formally directed otherwise." The CO reiterated the government's concerns about the project's progress. He noted that BCS had to "achieve satisfactory placement of concrete on Taxiway Juliet prior to the start of work at Taxiway Mike. . . ." (App. supp. R4, tab 74) On December 8, 2014, BCS submitted its Proposed Techniques/Paving Plan and three days later, the COE, BCS, and BCS's subcontractors participated in a preparatory meeting for placement of concrete (JSF ¶ 28-29). The slipform paver arrived on site on December 12, 2014, and on December 17, 2014, Test Lane 2 was placed at Taxiway Juliet using the slipform method (JSF ¶¶ 29-30). BCS successfully completed the paving at Taxiway Juliet by February 2, 2015 (JSF ¶ 32).

*BCS's Subcontracts with RC Construction Co. for Slipform Paving at Taxiway Mike*

72. As of December 2014, RC Construction Co. (RC) had an existing batch plant on Pope AAF in close proximity to the Taxiway Mike project site (JSF ¶ 34). On December 15, 2014, BCS entered into a subcontract with RC for concrete placement using the slipform method at Taxiway Mike (JSF ¶ 33; R4, tab 35).

73. At no point during performance did BCS request an alternate batch plant location on Pope AAF (JSF ¶ 41; R4, tab 43 at 31).

74. BCS alleged that there was supposed to be a batch pant site available for its use at Taxiway Mike, but it was unavailable when BCS began performance (app. br.

at 28). As we found in FOF 21-22 above, the contract stated that the area was being used and when the current contractor was done, it would remove the batch plant. The government's response to another bidder's inquiry made clear that it was not known when this would occur. We find that by entering into a subcontract with RC, BCS made a business decision to use a company with an existing batch plant at Pope AAF rather than finding another company that would need to build or furnish its own batch plant. Further, the government granted BCS's January 12, 2015 request to waive its requirement for a test lane at Taxiway Mike, and agreed to accept instead RC's successful performance of a lane under another contract at Pope AAF that had used the same equipment (R4, tab 24 at 2183-84; tr. 4/195-96).

75. On February 26, 2015, BCS submitted its Paving Plan for Taxiway Mike (JSF ¶ 35; R4, tab 37).

76. As a result of the bilateral agreement in Modification 1A, BCS could not begin work on Taxiway Mike before it was available from April to May 2015. This was the first of two periods during which the contractor could work there. (R4, tab 16 at 152-56; FOF 62)

77. On April 2, 2015, the parties conducted a preparatory meeting for airfield paving at Taxiway Mike (JSF ¶ 36).

78. From April 20, 2015 through May 11, 2015, BCS's subcontractor, RC, placed the required lanes at Taxiway Mike using the slipform method (JSF ¶ 37).

79. On June 18, 2015, both Taxiway Juliet and Taxiway Mike passed final inspection and BCS achieved substantial completion of the project (R4, tab 24 at 2342-43, tab 25 at 3047).

*BCS's Request for Equitable Adjustment, Claim, and Notice of Appeal*

80. In a Request for Equitable Adjustment (REA) dated December 22, 2015, BCS formally requested $1,474,200.33 in additional compensation (JSF ¶ 38; R4, tab 38 at 2). The REA was denied by the CO on May 4, 2016 (JSF ¶ 39; R4, tab 39).

81. On June 22, 2016, BCS submitted a certified claim for $1,474,200.33 in additional compensation (JSF ¶ 40; R4, tab 40). BCS claimed under the contract's standard Federal Acquisition Regulation (FAR) clauses for Disputes, Default, and Changes (R4, tab 40 at 4059). FAR 52.233-1, DISPUTES (JUL 2002), FAR 249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984), and FAR 243-1, CHANGES (JUN 2007) are found in the contract at R4, tab 5 at 1085-86, 1118-19, and 1099 respectively.

20

82. By correspondence dated January 17, 2017, the CO issued a final decision (COFD) denying BCS's claim (JSF ¶ 42; R4, tab 2).

83. BCS filed its Notice of Appeal with the Board on April 12, 2017, and the case was docketed the same day as ASBCA No. 61118.

DECISION

*I. Overview of the Appeal, the Parties' Contentions, and Appellant's Burdens of Proof*

To summarize key findings and the parties' dispute in this appeal, the contract allowed the contractor to choose between either the slipform method or the fixed-form method, to pave at Taxiway Juliet and Taxiway Mike. While BCS did not have to use the same method at both airfields, its choice of process in making its bid was critical, as the contract premised using these methods upon differing requirements for product composition and source, transport, equipment, personnel, time constraints, and manner of placement. Importantly, the contract as entered into allowed ready mix concrete to be used for slipform paving but did not allow its use for fixed-form paving.

*The Parties' Contentions*

In seeking to recover additional costs at Taxiway Juliet, BCS asserts that the contract is comprised of design specifications that carry an implied government warranty (*see, e.g*., app. br. at 14-26), but the contract's use of the undefined "term 'haul time'" is a latent ambiguity rendering the specifications defective (*id*. at 20-21) that made performance impossible (*id*. at 21-26). BCS denies it is foreclosed from recovery for failing to conduct a pre-bid site visit. It asserts that because there was "no scheduled site visit" prior to bid, the government in effect "deleted the site visit requirement from the contract." Thus, "it was reasonable for contractors to assume that the project could be completed as specified, and the COE assumed the risk of faulty specifications." (*Id.* at 26-27; app. reply br. at 25)

To recover for allegedly additional work at Taxiway Mike, BCS argues that it is entitled to costs under the contract's Changes clause because the government constructively changed the contract. It says that the government required BCS to "achieve satisfactory placement of concrete on Taxiway Juliet prior to the start of the work at Taxiway Mike," even though the contract did not require this sequence. Appellant contends this "direction, coupled with the threat of termination, may also be considered an order to accelerate" performance. (App. br. at 28-29) BCS next maintains that the government changed the contract by failing "to make the batch plant site that was

21

specified in the contract available" for appellant's use at the time BCS was ready for it. It says that this shortcoming, along with the government's failure to offer an equivalent alternative site, resulted in appellant having to hire RC and perform the work "in a different manner than originally intended and at extra cost. (*Id*. at 29-30)

The government agrees these were design specifications, but denies the contract was ambiguous or impossible to perform. It argues that BCS cannot recover under the theories espoused because appellant failed to prove it reasonably relied at bid upon the interpretation it now urges and did not avail itself of a pre-bid site investigation that would have disclosed the availability of offsite locations for batch plants. (*See* gov't br. at 59-70) As to the alleged constructive changes at Taxiway Mike, the government asserts that BCS has not proven that it relied to its detriment at bid on using the batch plant site at Taxiway Mike or that it would be available for use at a particular time; appellant's use of RC was a business decision and not the government's responsibility; and the contractor was not delayed by the government but performed in accordance with Modification 1A, which contained a release of all related claims (*id*., 70-73).

Appellant rejoins that the government "misses the point" in arguing that BCS "cannot show pre-bid reliance on its interpretation of 'haul time,'" because it is the contractor's "inability to locate a batch plant offsite and meet the haul time requirement that makes it impossible to meet the contract requirements" (app. reply br. at 23). BCS contends that "Sid Brantley clearly and unequivocally testified he relied on the specifications" in developing the contractor's bid. "Relying on the specifications, [BCS] believed the contract requirements for concrete placement, including the haul time requirements, could be met." (*Id*. at 23) It maintains its position that the government constructively changed the contract at Taxiway Mike (app. reply br. at 27-29).

*Appellant's Burden of Proof*

BCS bears the burden of proof for this appeal under the various legal theories it advances. Because it contends that the contract was defective and latently ambiguous for work at Taxiway Juliet regarding the contractor's ability to locate a batch plant within a 15-minute haul time, BCS must prove three things occurred prior to contract award. First, appellant must establish that the contract as advertised was ambiguous; second, that this ambiguity was latent (*i.e*., not obvious) and did not trigger a pre-bid duty on the part of a bidder to inquire; and third, that BCS reasonably relied at bid upon the interpretation it now urges. *See Optimization Consulting, Inc*., ASBCA No. 58752, 19-1 BCA ¶ 37,426 at 181,904 (citing *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) and *Fruin-Colnon Corp. v. United States*, 912 F.2d 1426, 1430 (Fed. Cir. 1990)). This third criterion of reliance at bid may also be established where a contractor can prove that it then relied upon the interpretation of a subcontractor, as under appropriate circumstances, a subcontractor's bid to the prime can be imputed to appellant. *See Froeschle Sons, Inc., v.*

*United States*, 891 F.2d 270, 272 (Fed. Cir. 1989) and *M.A. Mortenson Co.*, ASBCA No. 53647 *et al.*, 06-2 BCA ¶ 33,400 at 165,581.

Appellant cannot recover if it fails to prove any of these elements, as "An ambiguity will only be construed against the government if it was not obvious on the face of the solicitation and reliance is shown." *NVT Techn., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004). However, even if BCS meets these pre-bid requirements, it is protected only to the extent that it proves its compliance with the defective specifications resulted in its injury; *see Pyrotechnic Specialties Inc.*, ASBCA No. 57890 *et al.*, 17-1 BCA ¶ 36,696 at 178,693-94 citing *White v. Edsall Constr. Co.*, 296 F.3d 1081, 1084-85 (Fed. Cir. 2002) (citing *United States v. Spearin*, 248 U.S. 132, 136 (1918)).

As to BCS's contentions that the government constructively changed the contract at Taxiway Mike regarding the timing and sequencing of work, availability of the onsite batch plant site, and BCS's hiring of RCC, appellant must prove that it "perform[ed] work beyond the contract requirements, without a formal order under the Changes clause, due either to an express or implied informal order from an authorized government official or to government fault." *Circle LLC*, ASBCA No. 58575, 15-1 BCA ¶ 36,025 at 175,974 citing *Bell/Heery v. United States*, 739 F.3d 1324, 1335 ((Fed. Cir. 2014); *Int'l Data Products Co. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007); *Versar, Inc.*, ASBCA Nos. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,122. *See Mountain Chief Mgmt. Servs., Inc.*, ASBCA No. 58725, 15-1 BCA ¶ 35,831 at 175,201 (quoting *Northrop Grumman Sys. Corp. Space Sys. Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,242-43).

## II. Analysis of BCS's Arguments

### A. Alleged Defective Specifications at Taxiway Juliet

BCS alleges that the project specifications provided by the government were defective design specifications. BCS claims it determined "after award" that it was impossible to comply with the haul time requirements to accomplish the slipform paving method, the "less expensive" method it intended to use. (App. br. at 14-15) Additionally, BCS alleges that "haul time" as used in the specifications, was ambiguous (*id*. at 15). The government opposes BCS's allegations, and argues that the contract's haul time requirement for slipform placement was not impossible or ambiguous (gov't br. at 53). The government also claims that BCS did not do its pre-bid due diligence or place its bid on the project consistent with one of the two authorized methods of placement as specified by the contract requirements (gov't br. at 73). Although BCS makes many arguments about the particular specifications being design specifications, the government

never disputed this assertion, and admits that the specifications are design specifications (app. br. at 16; gov't reply br. at 9).

Design specifications "describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is 'required to follow them as one would a road map.'" *Revenge Advanced Composites*, ASBCA No. 57111, 11 BCA ¶ 34,698 at 170,883, quoting *Blake Constr. Co. v. United States*, 987 F.2d 743, 745 (Fed. Cir. 1993)). "When the Government requires a contractor to follow detailed plans and specifications, it is well-established that it impliedly warrants that if the specifications are followed, the result will be adequate." *D.E.W., Inc.*, ASBCA No. 35896, 94-3 BCA ¶ 27,182 at 135,459 (internal citations omitted). In cases where the government provides alternate methods by which a contractor can complete a project, "the [g]overnment's warranty of its specifications extends to both options." *SPS Mech. Co., Inc.*, ASBCA No. 48643, 01-1 BCA ¶ 31,318 at 154,692 (citations omitted).

Here, the design specifications for placement of concrete carried an implied warranty that a batch plant could be located off Mackall AAF and that BCS could meet the 15-minute haul time requirement if it chose to use the slipform method, or, if it chose to use the fixed-form method, that the concrete could be deposited in front of the pavers within 90 minutes of charging the cement. Appellant does not dispute that it was possible to meet the 90-minute time restriction using the fixed-form method (app. br.; app. reply br., *passim*). As such, the parties' dispute focuses on the 15-minute haul time requirement for the slipform method.

The warranty of specifications does not relieve BCS from its responsibility to comprehend the stated requirements of the specifications, investigate the site, and prepare its bid to comply with the requirements. Further, while the definition of haul time was discussed extensively at trial and in the parties' briefs, the Board does not need to reach a definition of haul time for this contract because BCS fails to demonstrate any pre-bid reliance, as required in order to recover. "The general rule is that 'where a contractor seeks recovery based on his interpretation of an ambiguous contract, he must show that he relied on this interpretation in submitting his bid.'" *Fruin-Colnon Corp.*, 912 F.2d at 1430 (quoting *Lear Siegler Mgmt. Servs. Corp. v. United States*, 867 F.2d 600, 603 (Fed.Cir.1989) (internal citations omitted). "The burden of proving reliance on the claimed interpretation thus falls on the contractor." *Fruin-Colnon Corp.*, 912 F.2d at 1430.

BCS failed to prove that its founder and estimator relied on the specifications for slipform placement when he created the bid (*see, e.g.*, FOF 25, 27, 32). Although BCS argues that Mr. Brantley bid the contract per the specifications (app. reply br. at 23-27), the evidence and Mr. Brantley's own testimony suggest otherwise and that he lacked an

adequate understanding of what was required by the contract to perform either slipform or fixed-form paving at these airfields. Mr. Brantley admitted that he did not know about the 15-minute haul time requirement prior to submitting BCS's bid (FOF 25, 35, 45). Additionally, the subcontractors that prepared pre-bid proposals for BCS did not rely on the 15-minute haul time when preparing their bids (FOF 28, 32, 36), nor was there any proof that either BCS or its subcontractors investigated the site or surrounding areas (*see* FOF 19, 23-25). Even as part of the post-award proposals, none of the subcontractors attempted to comply with the 15-minute haul time (FOF 42, 69). As such, BCS has not met the burden of proving reliance on the claimed pre-bid interpretations of the 15-minute haul time.

Instead of making an allegation of pre-bid reliance, BCS uses impossibility as a smoke screen to seemingly try to skirt the reliance requirement of recovery by alleging the specification was impossible. Still though, "[a]bsent evidence of the prime contractor's reliance on the specifications, we cannot conclude that appellant is entitled to prevail." *Clearwater Constructors, Inc*., ASBCA No. 45712, 96-2 BCA ¶ 28,495 at 142,293 (citing *Cf. Al Johnson Construction Co. v. United States*, 854 F.2d 467, 470 (Fed. Cir. 1988) (holding that the implied warranty of specifications did not run to a contractor failing to establish adherence to specifications)).

The arguments in this appeal parallel those in *Al Johnson Construction Co.* There, the appellant alleged that the Board erred in not making a finding related to whether specifications were defective. 854 F.2d at 470. The Federal Circuit held that "whatever defects existed would not make the implied warranty run to a contractor who did not construct the berm as the contract provided he should." *Id.* The Court explained its rationale succinctly, stating:

> The contractor who is awarded an Army Engineers $14,151,922 contract presumably has examined the plans and specifications, visited the site, and satisfied himself that the job could be done within the sum bid. There is nothing to show when or how the contractor became disillusioned with respect to the berm. He did recommend certain changes, which were rejected, in the way the berm was to be constructed, but does not assert he gave warning that the berm would fail unless it was built as he recommended. He does not show us when, or even whether, he became convinced that the berm design was defective. We think the restriction of the implied warranty to those who have fulfilled the specifications, or tried and failed to do so because of the defects themselves, has <u>strong policy behind it that would not be served by allowing the implied warranty to run to one who</u>

> has not done what he contracted to do and fails to
> satisfactorily explain why not. Any other exception should
> therefore be restricted to instances, not now foreseen, of
> manifest inequity, or to a deviation from the specifications
> shown to have been entirely irrelevant to the alleged defect.

*Id*. (emphasis added)

Here, we have found that BCS never proved that it intended at bid to use either of the methods for performance in the manner required under the contract, nor did it show that it understood how the method(s)/costs proposed by its pre-bid subcontractors related to what BCS bid to the government. Proof of the making of the contractor's bid yields little solid information other than the price BCS offered for each airfield, and provides at best an inchoate explanation of what the contractor thought about how it might do the work under this lump sum (fixed-price) contract. (*See, e.g*., FOF 24-25, 27-38)

Instead, BCS proved only that it had a theoretical idea of how it would complete the project using subcontractors, and when that idea never came to fruition, it decided to make an issue of the haul-time. It was not until November 2013, two months after the contract was awarded, that the issue of haul time was raised to BCS by one of the subcontractors it was trying to work with (FOF 38, 46). Even then, the reason the subcontractor raised the issue was because the subcontractor was not in a position to place a portable batch plant within the 15-minute haul time requirement. Instead, the subcontractor wanted to keep costs low by using its own plant more than 45 miles away from Taxiway Juliet. (FOF 49-50)

When BCS presented the government with its initial request for a deviation, it did not state that meeting the specification was impossible, only that its subcontractor wanted to use the slipform method with ready mix concrete, which was not permitted by the contract. The request did not indicate there was an inability to place a portable batch plant within the 15-minute haul time specified in the contract. (FOF 58) In fact, while there is a lack of clarity as to just what appellant bid (FOF 27-36), BCS later stated that it bid the project with the intent to deviate from the contract requirements (FOF 66).

Like the appellant in *Al Johnson Construction Co.*, BCS did not attempt to fulfill the specifications as required. BCS admitted it never intended to try to comply with the specifications, and, even if we did find impossibility, which we hold we do not need to address, the protection of an implied warranty does not apply to a contractor that has not done what it contracted to do.

We find that BCS did not rely on compliance with the 15-minute haul time as part of its bid or even during its attempted performance (FOF 13, 19, 23-25, 35-36). Because

26

we do not find a breach of the implied warranty, BCS is not entitled to recover any costs proximately flowing from the alleged breach, including the costs of its own failed fixed-form placement attempt. *See Am. Ordnance, LLC*, ASBCA No. 54718, 10-1 BCA ¶ 34,386 at 169,795-96. As such, BCS is not entitled to recover for any additional costs related to the performance at Taxiway Juliet.

### B. Alleged Constructive Changes at Taxiway Mike

BCS contends that the government constructively changed the work at Taxiway Mike at Pope AAF (app. br. at 27-30). Appellant alleges it was wrongly made to first finish its work at Taxiway Juliet, which it says was delayed due to haul time issues; the government failed to make available the Pope AAF batch plant site (or "an equivalent alternate site") as required by the contract; and, as a result, BCS was made to hire RC to do slipform paving at Taxiway Mike (*id*. at 27-29).

The government responds that not only was BCS aware at bid that the batch plant site was already occupied, BCS was never given a date the site would be available (gov't br. at 70). The government argues that because BCS did not include a portable batch plant in its bid and provided no evidence there was a batch plant it intended to rent, BCS did not prove its intention of or ability to construct a batch plant at Pope AAF (gov't reply br. at 14).

### II.B.1 Alleged Constructive Change by the Government Regarding Sequencing of Work at Taxiway Mike and Taxiway Juliet

We have rejected BCS's contentions regarding Taxiway Juliet in Decision § II.A, *supra*. We further have found that BCS agreed to limitations on the periods when it was allowed to work at Taxiway Mike in bilateral contract Modification 1A, in which it released all claims relating to the modification (FOF 62, 76). Consequently, we hold that appellant failed to prove the government constructively changed the contract or was at fault for delays associated with the haul time.

### II.B.2 Alleged Constructive Change by the Government Regarding As-Planned Work at Taxiway Mike

Appellant states that the alleged constructive change at Taxiway Mike was not to the scope of the contract, but to the contractor's planned method of performance there:

> The COE's failure to make the batch plant site that was specified in the contract available for [BCS's] use was unquestionably a change to the contract. Mr. Maher's testimony that [BCS] was forced to hire RC to perform the work at

Taxiway Mike demonstrates [BCS] was compelled to do work in a different manner than originally intended. While the scope of [BCS's] work was not changed, the method that [BCS] was entitled to use and intended on using to perform the work clearly was. Finally, [BCS] clearly did not volunteer to perform the work differently, but had to perform the work under the threat of termination. Those facts support entitlement for a constructive change to the contract.

(App. br. at 29)

BCS takes exception to the government's assertions that BCS "has not demonstrated that it relied to its detriment that the designated batch plant site location would be available for [BCS's] use"; the contractor was on notice that the date of the site's availability was uncertain following the government's answer to another's pre-bid inquiry; and, "there is no evidence that [BCS's] bid included the cost of a batch plant at Taxiway Mike." Appellant dismisses these by proclaiming that "Reliance is not an issue. The simple issue is: Did the COE change the contract by not making the designated batch plant site location available for [BCS's] use" in accordance with the specifications?" (App. reply br. at 28)

BCS errs, as proof of reasonable reliance upon the contract at the time of bid is an essential element to a contractor's recovery for a constructive change (*C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543-44 (Fed. Cir. 1993)). To prevail on its argument that the government constructively changed the contract regarding the batch plant site at Pope AAF near Taxiway Mike, BCS must prove that it reasonably interpreted the contract at bid to require that this batch plant location would be available when BCS was ready to begin that work, and that it was caused by the government to perform in a manner other than planned in its bid. It is necessary that BCS do both, as the purpose of the contract's Changes clause is to protect the contractor being made by the government to perform uncompensated work beyond contract requirements. A contractor's recovery for a constructive change is premised upon the "altered position" in which it finds itself "by reason of performing the 'changed' work'" *LWJV* I, 19-1 BCA ¶ 37,301 at 181,453-54 citing *Atherton Constr. Inc.*, ASBCA No. 56040, 08-2 BCA ¶ 34,011 at 168,191 (further citations omitted). Proof of that "altered position" is contingent upon demonstrating the difference between how the contractor bid to do the work and how it was made to perform (*Fruin-Colnon Corp.*, 912 F.2d at 1431-32).

The greatest flaw to BCS's argument of a constructive change at Taxiway Mike is that it failed to prove that it reasonably interpreted and relied upon the contract at bid, and was made by the government to do anything differently than anticipated. Any superficial appeal to BCS's assertion that the contract obligated the government to make available

28

the batch plant site at Taxiway Mike when BCS was ready to use it is defeated by appellant's failure to reconcile its expectations under that provision with the government's pre-bid inquiry response that it was uncertain when RC would vacate that area (*see* FOF 18, 20-22). A contractor is not allowed to dismiss that type of information out of hand, nor does it become irrelevant once the contract is entered into.[7] The Board has held that pre-award questions and answers "are very important because bidders are entitled to rely on the government's answers. . ." which "are not 'wiped from the record by the formal execution of the contract.'" These are "highly relevant to the post award interpretation of contract provisions." *Fluor Fed. Solutions, LLC*, ASBCA No. 61093, 19-1 BCA ¶ 37,424 at 181,892-93 (further citations omitted).

The evidence it presents does not demonstrate, and appellant does not aver, that BCS's bid for the project included costs to set up a portable batch plant at Taxiway Mike (*see, e.g.*, FOF 27-36). Although his testimony is at times unclear and there is a lack of detail about how he planned for BCS to do the work on the project (*id.*), Mr. Brantley testified that he did not include a batch plant for work at Taxiway Mike as it was unnecessary to do so (FOF 27). Appellant failed to prove it performed this work contrary to its at-bid planned execution or that the government constructively changed the contract in that regard.

### II.B.3. Alleged Constructive Change for the Government's Failure to Provide an Equivalent Alternate Batch Plant Site at Taxiway Mike

Although appellant says "the COE constructively changed the contract by failing to provide an equivalent alternate site for [BCS] to use for a batch plant" at Taxiway Mike (app. br. at 29), that argument it without merit. BCS agreed that it did not request an alternate site to construct a batch plant and it did not coordinate an alternate batch plant site with the CO (FOF 73).[8] The contractor did not request an alternate location, and has offered no proof that the government constructively changed the contract by failing to offer one.

---

[7] As neither party advances the argument that the government's response to the pre-bid inquiry caused an ambiguity, it is unnecessary that we address that legal theory. In any event, the outcome would be the same in that establishing either type of ambiguity (i.e., patent or latent) requires proof of pre-bid reliance on a consistent and reasonable interpretation of the contract (*LWJV* II, slip op. at 74-76).

[8] We note that after award, BCS unsuccessfully attempted to obtain a portable batch plant from both Ready Mixed Concrete Co. and McCarthy (FOF 55, 57), and appellant offered no evidence it succeeded in locating one from another subcontractor.

*II.B.4.  Alleged Constructive Change with Regard to BCS's Hiring of RC for Work at Taxiway Mike*

The Board does not find BCS's assertions persuasive that the government constructively changed the contract or "forced" it to hire RC to perform at Taxiway Mike.  The weight of the evidence supports the government's position that BCS made a business decision to use the subcontractor that already had a batch plant next to Taxiway Mike (FOF 74).  Appellant's contention that it "did not volunteer to perform the work differently, but had to perform the work under the threat of termination" (app. br. at 29) is unavailing, as it was BCS's poor performance at Taxiway Juliet (it "failed miserably") that brought its ability to successfully complete the contract into doubt (FOF 60-61, 63-66).  Appellant offers no proof of government participation in, much less causation of, BCS's decision to hire RC for the work at Taxiway Mike.

As noted above, BCS did not include the cost of constructing or otherwise obtaining a batch plant in its bid (nor did its potential subcontractor), which might have lent some support to BCS's allegation that it (or its subcontractor) intended to put its own batch plant at the site (*see* FOF 73).  Lacking this proof of reasonable reliance, or of improper government action, BCS is not entitled to recover additional compensation based on the business decision it made to perform its obligations under the contract.

*II.B.5  Appellant's Release of All Claims in Contract Modification 1A Including Schedule and Work at Taxiway Mike*

Although this is mentioned in conjunction with alleged delays resulting from the sequencing of work with Taxiway Juliet, we note in conclusion that although BCS claims its performance was delayed by the several alleged constructive changes caused by the government at Taxiway Mike (app. br. at 27-30), BCS also entered into bilateral Contract Modification 1A that extended performance by 264 days and limited work at Taxiway Mike to April through May or September through October 2015 (FOF 62).  Even assuming *arguendo* that BCS was delayed by the government for the work at Taxiway Mike (and we do not so find), appellant presented no proof that appellant was delayed beyond time authorized in the contract.

## CONCLUSION

We have considered all arguments advanced by the parties. BCS has failed to meet its burden of proof. The appeal is denied.

Dated: January 28, 2021

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61118, Appeal of Brantley Construction Services, LLC, rendered in conformance with the Board's Charter.

Dated: January 29, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals