## AL JOHNSON CONSTRUCTION COMPANY, Appellant,

v.

## The UNITED STATES, Appellee.

No. 88-1068.

United States Court of Appeals, Federal Circuit.

Aug. 18, 1988.

Wellington H. Law, of Carlson, Greiner & Law, Edina, Minn., argued for appellant. With him on the brief was John B. Tacke, of Hudson, Creyke, Koehler & Tacke, Alexandria, Va.

Stephen J. McHale, of the Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. On the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Mary Mitchelson, Asst. Director, and Cheryl S. Rome. Of counsel was Terry A. Stepp, of the Dept. of the Army, Corps of Engineers, Mobile, Ala.

Before MARKEY, Chief Judge, NICHOLS, Senior Circuit Judge, and RE, Chief Judge.*

NICHOLS, Senior Circuit Judge.

This contract appeal arises under a construction contract awarded as long ago as 1973 by the Army Engineers, with performance date extended to January 2, 1978, but the original dispute was converted to claims under the Contract Disputes Act of

---

* The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation pursuant to 28 U.S.C. § 293(a).

1978, 41 U.S.C. § 601 and ff. The contractor elected to appeal to the Corps of Engineers Board of Contract Appeals under section 606 the unfavorable portions of the contracting officer's decision. The board's decision, *Al Johnson Construction Co.*, ENG BCA Nos. 4078, 4818, 87–3 BCA (CCH) ¶ 19,980 (July 13, 1987) [available on WESTLAW, 1987 WL 41165], allows the claims in part, but rejects the largest portion, and the appeal here is not accompanied by any government cross-appeal. The issues are mostly factual, as to which our scope of review is limited as stated in 41 U.S.C. § 609(b)** and in *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 814 (Fed.Cir.1984). There is an important legal issue novel to this court, and apparently to the board and parties, as to the proper scope and application of the *Spearin* doctrine (*United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918)). According to *Spearin*, if a construction contractor is bound by contract to build according to plans and specifications provided by the owner, he will not be responsible for the consequences of defects in the plans and specifications. On the contrary, there is an "implied warranty" (248 U.S. at 137, 39 S.Ct. at 61) that *"if the specifications were complied with "* (emphasis supplied), the work would be adequate. The implied warranty is not overcome by the customary self-protective clauses the government inserts in its contracts, as in *Spearin* itself, requiring the contractor to examine the site, to check the plans, and to assume responsibility for the work, including its safekeeping, until completion and acceptance. The *Spearin* doctrine is much alive today, and we have recently had occasion to extend and apply it in a case other than a construction contract dispute. *USA Petroleum Corp. v. United States*, 821 F.2d 622 (Fed.Cir.1987).

The problem here is how the implied warranty is to be applied in an instance when the contractor has not fully complied with the specifications he asserts were defective. We determine that the board was substantially correct in its handling of this matter in view of its factual conclusions which have been much debated by the parties, but which are outside the proper scope of our review. We therefore affirm.

*Background*

The contract was for construction of a spillway near Gainesville, Alabama, as a part of the Tennessee–Tombigbee Waterway project. The work was estimated to require 35 months to complete, 45 from the Notice to Proceed. It was to be completed in two stages. Stage I consisted of work on the right bank of the river (facing downstream) requiring a cofferdam and cofferdike, sheltering excavation and concrete placement, among other matters. Upon completion of that stage, Stage II would follow a move called a "switchover" from one bank to the other, and on the left bank extended work would follow to completion. The "switchover" could only be effected in dry weather, so anything that delayed the "switchover" to a wet (winter) season could result in compounding the delay. Thus delays in Stage I could have an impact far exceeding the length of such delays.

The claims were not for contract breaches, but under the Changes, Differing Site Conditions, and Variations in Estimated Quantities Clauses. The nexus between these clauses and the actual facts of the claims is not discussed. The original *Spearin* case was a breach case, but provisions within contracts for contract relief were not yet in use when the *Spearin* contract was awarded. It might be assumed today that the facts of that case would now be dealt with as a constructive change order and compensable within the contract

**\*\* § 609. Judicial review of board decisions**

**(b) Finality of board decision**

In the event of an appeal by a contractor or the Government from a decision of any agency board pursuant to section 607 of this title, notwithstanding any contract provision, regulation, or rules of law to the contrary, the decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

changes article, and therefore not now a breach.

The contractor was allowed extensions of time for delays caused by inclement weather. These did not allow for added overhead resulting from delay, or for direct costs incurred owing to alleged derelictions by the government, and such added costs are the subject of the present appeal.

The board dealt first with delay and added cost incurred in constructing an access road to the right bank worksite. The board allowed a constructive change for conditions contrary to the contract specifications, which it considered to have been defective. It allowed 43 days' delay from the access road problem alone, which allowance is not disputed before us. A delay of 43 days alone would not have sufficed to postpone the switchover until after inclement weather had begun, with its potential for compounding the costs. We are not asked to review the 43 days' allowance for the access road and problems related to it, and do not do so.

The board dealt next with the so-called "berm failure" problem. The contract required the contractor to provide a temporary "berm" on the right bank to be placed against "coffercells" and impart stability to them. It was to be a sort of sand dune. The river commenced to rise December 24, 1974, due to heavy rains, at which time the berm was not completed, being 7–to–8–to–10 feet below the specification height of 22 feet. There was not sufficient contractor personnel to deal with the situation because of the season, and there was not enough material at the site to complete the berm. Water began to percolate through the coffercells into the berm and December 26 it commenced to liquify and slough away. Its material spread out into an excavated area, causing a mess that had to be cleared away before work could resume. The board did not believe a witness for the contractor who said the deficient height of the berm had nothing to do with its failure, and apparently did believe a government witness who said, more cautiously, the berm, if of full height, might or might not have failed. The board speculated that the inadequate height of the berm might have caused instability of the coffercells causing them to open up and admit passage of more water than would have been the case with a berm of specification size. It did not so find and clearly did not think it was required to find whether the berm specification was defective or whether any such defect, of several the contractor pointed out, would have caused the failure. It accepted, at least arguendo, that the berm failure caused a 38–day delay, but refused to find it was a compensable delay.

The contractor strove mightily to complete the necessary right bank work before the last possible switchover date in 1975, but failed to meet it, and consequently was unable to switchover until 1976. It claimed, and claims here, a total of 81 days' delay from the combined figures of the access road and berm failure delays, resulting with compounding in a delay figure of 280 days in total for completion of the entire contract. The board simply refused to accept the contractor's proofs as adequate to show that any such compounding occurred, attractive as the notion is in theory, and when one has not confronted all the complicating facts present in real life.

### Discussion

In Justice Brandeis' opinion in *Spearin,* it is flatly stated that the implied warranty runs to contractors who have complied with the specifications. The same interpretation emerges even more plainly from the decision below which the Supreme Court affirmed, *Spearin v. United States,* 51 Ct.Cl. 155 (1916), wherein at 172 is quoted, with approval, a state court decision (*Bentley v. State,* 41 N.W. 338, 73 Wis. 416 (1889)) as follows:

> Under the contract it is very manifest that, had the plaintiffs departed from such plans and specifications and refused to follow the directions of the architect, there could have been no recovery for the building of the south wing, even had they in the first instance built it as they were finally directed by the architect to do. On the contrary, they could only recover by furnishing materials and do-

ing the work according to such plans, specifications, and directions as they allege they did.

See also *J.L. Simmons Co. v. United States*, 412 F.2d 1360, 1373, 1382 (Ct.Cl. 1969). Of course, this is subject to the exception that contractors can stop performing when the results of actual experience with performance to date reveal that the specifications are defective to the degree they cannot, as a matter of commercial possibility, be complied with. This was the fact situation in the *Spearin* case itself. There was no showing here that the defect of the specifications was of a kind that produced impossibility. Rather, appellant attempted to show the board that the berm would have failed anyway, even if it had met the specification completely.

What would have happened in the event of a contingency that did not occur is speculation at best. To show it as the board rightly says, "is a difficult burden" which the board deemed as a factual conclusion "has not been met." We can find no fault with this. As a conclusion of law, it is reasonable to throw the burden on the contractor to prove his nonconformance to specifications had no logical relationship to the failure of the berm. It is reasonable to call it a "difficult burden." The conclusion that, as a matter of fact, it was not met is beyond questioning by us in view of our limited scope of factual review. If the implied warranty does not shelter the contractor, he loses on this issue because the General Provision 12—Permits and Responsibilities, places on the contractor all risk to materials and work performed until acceptance occurs.

The contractor who is awarded an Army Engineers $14,151,922 contract presumably has examined the plans and specifications, visited the site, and satisfied himself that the job could be done within the sum bid. There is nothing to show when or how the contractor became disillusioned with respect to the berm. He did recommend certain changes, which were rejected, in the way the berm was to be constructed, but does not assert he gave warning that the berm would fail unless it was built as he recommended. He does not show us when,

or even whether, he became convinced that the berm design was defective. We think the restriction of the implied warranty to those who have fulfilled the specifications, or tried and failed to do so because of the defects themselves, has strong policy behind it that would not be served by allowing the implied warranty to run to one who has not done what he contracted to do and fails to satisfactorily explain why not. Any other exception should therefore be restricted to instances, not now foreseen, of manifest inequity, or to a deviation from the specifications shown to have been entirely irrelevant to the alleged defect.

Appellant requests a remand to the board with directions to make express findings lacking in the decision before us, whether the berm specifications were defective. Such findings would have been irrelevant if, as we hold, whatever defects existed would not make the implied warranty run to a contractor who did not construct the berm as the contract provided he should.

As to the compounding of the delay to 280 days, the board rests its negative conclusion on fact findings we are not at liberty to reverse; whether or not we would have so held on the evidence. The substantial evidence rule necessarily shelters the board's findings from rethinking by us of conclusions based on substantial evidence. The entire circumstances of the case may lead at times to disregard of uncontradicted but conclusory evidence that, considered by itself, might be persuasive. The board criticizes the "bar chart" appellant provided which lacked a "critical path," a favorite device with present day fact finders in contract disputes. There were, as always, numerous delays, not all of which even appellant blames on the government. The board says if it had allowed a full 81 days before the switchover, a compounded finding of 280 days would not have necessarily followed. The switchover could have occurred in 1975 if either the 43 days' or the 38 days' delay had been avoided; thus the case for compounding really depends on both being blamed on the government.

It appears to us the board has not been arbitrary or capricious, and does have the support of substantial evidence in concluding it cannot allow compounding to reflect delays in the left bank work, caused by the delayed switchover. It is not given to us, under the statutory review standards, to insist that the board accord more credence to opinion evidence of any kind than it is willing to do. It is a complex matter to find how various causes of delay interacted upon one another to produce a conclusion the government should allow a longer delay than the single item it is responsible for would require, considered separately. As stated in *Erickson Air Crane,* we attach value to the board's legal conclusions because of its expertise, and this is of course even more true of its analysis of the kind of fact issues which must, in the last analysis, be matters of opinion, considering the finality of its decisions as stated in 41 U.S.C. § 609(b).

### Conclusion

The decision appealed from is affirmed. AFFIRMED.