Thomas E. WHITE, Secretary of the Army, Appellant,

v.

EDSALL CONSTRUCTION COMPANY, INC., Appellee.

No. 01–1628.

United States Court of Appeals, Federal Circuit.

DECIDED: July 2, 2002.

---

Phyllis Jo Baunach, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With her on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Craig S. Clarke, Attorney, U.S. Army Legal Services Agency, Contract Appeals Division, Department of the Army, of Arlington, VA.

Jon G. Sarff, P.L.C., Adamson & Sarff, of Mankato, MN, for appellee.

Before RADER, SCHALL, and LINN, Circuit Judges.

RADER, Circuit Judge.

Thomas E. White, Secretary of the Army, appeals the decision of the Armed Services Board of Contract Appeals (Board) holding that a disclaimer on a design drawing did not shift the risk of a design defect to Edsall Construction Company, Inc. *Edsall Construction Co.*, ASBCA No. 51787, 2001 WL 583470 (May 21, 2001) (*Edsall*). Because the Board correctly held that the general disclaimer did not shift the risk to Edsall, this court affirms.

## I.

In May 1996, the U.S. Army awarded Edsall a fixed-price contract for the construction of a facility to house the Montana National Guard's helicopters. The facility specification included two hangars designed for the Army by Schlenker and McKittrick Architects (SMA) and Design 3 Engineering, Inc. The specification and drawings called for "tilt-up canopy door[s]" weighing about 21,000 pounds each. The design used a complex system of motors, cables, pulleys, and counterweights to open the doors. As illustrated in the drawings, the cables attach to the doors at points called "pick points." The cables run from the pick points, up over a main truss, over one set of pulleys to another set of pulleys above the counterweights, and then down to the counterweights. The drawings also show the weight of each canopy door as distributed equally between three pick points.

Mr. William Oakey, a Design 3 structural engineer, designed the three-pick-point canopy door. Mr. Oakey placed a disclaimer on one of the drawings, drawing S13, stating:

CANOPY DOOR DETAILS, ARRANGEMENTS, LOADS, ATTACHMENTS, SUPPORTS, BRACKETS, HARDWARE ETC MUST BE VERIFIED BY THE CONTRACTOR PRIOR TO BIDDING. ANY CONDITIONS THAT WILL REQUIRE CHANGES FROM THE PLANS MUST BE COMMUNICATED TO THE ARCHITECT FOR HIS APPROVAL PRIOR TO BIDDING AND ALL COST OF THOSE CHANGES MUST BE INCLUDED IN THE BID PRICE.

Mr. Oakey testified that he added the disclaimer as an "informational flag" to bidders that they should verify the three-pick-point design. He further annotated the drawing with dotted lines or "v" (for "verify") to indicate some schematic details. Several annotations asked the contractor to verify the door weight and the weight per pick point.

Edsall subcontracted the canopy door construction to Uni–Systems, Inc. (USI). USI has substantial experience in designing and building hangar doors. USI's owner, Mr. Cyril J. Silberman, testified that he read the disclaimer on drawing S13 as a "heads up that there may be problems

with the drawings." Mr. Silberman also testified that when he looked at the drawings, he saw nothing "obviously wrong," and the drawings appeared "pretty well-engineered."

After the contract award, USI discovered that the three-pick-point design would not work. In October 1996, USI sent Edsall a sketch of a four-pick-point design and a letter explaining that the three-pick-point design was unworkable. Edsall then informed the contracting officer (CO) that USI proposed a four-pick-point design. The CO understood that the four-pick-point setup was a new design, but anticipated no additional cost to the Government. By February 1997, Edsall had informed the contracting officer representative that the three-pick-point design was unworkable.

In March 1997, USI submitted a structural drawing for the four-pick-point design, which the CO approved in April 1997. By the time the Government approved the new design, the steel trusses already had been fabricated by a different Edsall subcontractor and delivered to the site, thereby requiring USI to make additional modifications to the trusses to accommodate the new design with four pick points. In July 1997, Edsall informed the Army of its potential claim for additional costs incurred as a result of the new design. In June 1998, Edsall submitted USI's claim for an additional $70,000 based on the new design. The Army rejected the claim in July 1998 because USI had not requested the design change before bidding, as allegedly required by the disclaimer, and because USI's submittal for the new design did not state that it would increase construction costs. Edsall appealed to the Board on behalf of USI.

The Board found that the specifications incorporated defective design characteristics. The Board further held that Edsall's pre-bid review of the specifications was reasonable and that the disclaimer on drawing S13 did not shift any risk for design inadequacies to Edsall. Accordingly the Board awarded Edsall its additional costs.

## II.

This court reviews the Board's conclusions of law without deference. *Rex Sys., Inc. v. Cohen,* 224 F.3d 1367, 1371 (Fed.Cir.2000). Notwithstanding this lack of deference, the Board's legal interpretations are given careful consideration because of its expertise in interpreting government contracts. *Erickson Air Crane Co. v. United States,* 731 F.2d 810, 814 (Fed.Cir.1984) ("[L]egal interpretations by tribunals having expertise are helpful to us, even if not compelling."). The Board's findings of fact are final unless "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b) (1994).

When the Government provides a contractor with design specifications, such that the contractor is bound by contract to build according to the specifications, the contract carries an implied warranty that the specifications are free from design defects. *United States v. Spearin,* 248 U.S. 132, 136, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *see also Essex Electro Eng'rs, Inc. v. Danzig,* 224 F.3d 1283, 1289 (Fed.Cir.2000); *USA Petroleum Corp. v. United States,* 821 F.2d 622, 624 (Fed.Cir.1987). This implied warranty attaches only to design specifications detailing the actual method of performance. It does not accompany performance specifications that merely set forth an objective without specifying the method of obtaining the objective. Because the implied warranty protects contractors

who fully comply with the design specifications, the contractors are not responsible for the consequences ·of defects in the specified design. *Spearin,* 248 U.S. at 136, 39 S.Ct. 59.

■ Moreover, general disclaimers requiring the contractor to check plans and determine 'project requirements do not overcome the implied warranty, and thus do not· shift the risk of design flaws to contractors who follow the specifications. *Id.* at 137, 39 S.Ct. 59; *see also Al Johnson Constr. Co. v. United States,* 854 F.2d 467, 468 (Fed.Cir.1988) ("The implied warranty is not overcome by the customary self-protective clauses the government inserts in its contracts. . . ."). Only express and specific disclaimers suffice to overcome the implied warranty that accompanies design specifications. Absent such disclaimers, the contractor is entitled to any additional costs reasonably incurred to produce a satisfactory result.

■ The implied warranty, however, does not eliminate the contractor's duty to investigate or inquire about a patent ambiguity, inconsistency, or mistake when the contractor recognized or should have recognized an error in the specifications or drawings. *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 346 F.2d 962, 972–73 (1965). This duty requires contractors to clarify patent .ambiguities, but does not require them to ferret out hidden or subtle errors in the specifications. *Id.* at 973. As this court's predecessor, the Court of Claims, stated:

> [Contractors] are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are protected if they innocently construe in their own favor an ambiguity equally susceptible to another construction . . . [because] ambiguities in contracts drawn

by the Government are construed against the.drafter. *Id.*

In the present case, the Army authored the specifications .through its architects. The drawings, which form a part of the specifications, depict a canopy door with three pick points. The Board found that the canopy door shown in the drawings incorporated significant design characteristics. *Edsall,* slip op. at 4. Specifically, the Board concluded that the ·number of pick points and the distribution of the load at three points on the truss above the door constituted "design features that a bidder was expected to follow." *Id.* The Board also found that the three-pick-point door design was defective and would not have worked even if modified (i.e., if the location or spacing of the three pick points was altered). *Id.* at 11. On appeal, the Army does not contest that the three-pick-point design was defective.

The record also provides substantial support for the Board's finding that the three-pick-point door design constituted a design requirement ·rather than merely a performance specification. Because the disclaimer on drawing S13· required the contractor to seek clearance for "any condition that will require changes from the plans," Edsall could not alter the design without approval of the Army's architect. If the three-pick-point design had been merely a performance specification (i.e., it did not specify an actual method of performance), Edsall could have chosen any method of building a workable tilt-up canopy door, including a four-pick-point design. Because ·the Army made the three-pick-point door design, including the weight distribution to points on the truss, a design requirement, it warranted the adequacy of the design. The Army is thus responsible for the consequences of design defects absent an express and specific disclaimer

shifting the design risk to Edsall. *Spearin*, 248 U.S. at 136, 39 S.Ct. 59 (government responsible for design defects in specification that specified characteristics, dimensions, and location for a sewer).

On appeal, the Army contends that the disclaimer on drawing S13 clearly and plainly required Edsall to "verify" the three-pick-point design before bidding. Further, the Army argues that the Board's holding reads the disclaimer and drawing annotations .out of the contract. While agreeing that contractors should not be required to uncover hidden errors, the Army argues that Edsall had a duty to verify the design in this case.

■■ Although the disclaimer at issue requires the contractor to verify supports, attachments, and loads, it does not clearly alert the contractor that the design may contain substantive flaws requiring correction and approval before bidding. While suggesting the possibility of minor problems in the drawings, the disclaimer did not shift the risk of design flaws to Edsall. Like the disclaimer in *Spearin*, the disclaimer in this case is only a general disclaimer. It required Edsall to verify general details, such as door weight and dimensions, but did not alert Edsall to the prospect that the Army's design might not work for its intended purpose. As the Supreme Court stated in *Spearin*:

> [T]he insertion of the articles prescribing the character, dimensions and locations of the sewer imported a warranty that, if the specifications were complied with, the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. The obligation to examine the site did not impose upon him the duty of making a diligent inquiry ... with a

view to determining, at his peril, whether the sewer specifically prescribed by the government would prove adequate. The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view. 248 U.S. at 137, 39 S.Ct. 59 (footnotes omitted). This *Spearin* rule governs this case as well. The Army gave Edsall specifications for a design with three pick points. The contract bound Edsall to build according to the specified design, which was ·defective. Because the general disclaimer did not obligate Edsall to determine whether the Government's design would work for its intended purpose,· Edsall is not responsible for the consequences of design defects. Further, the mere fact that USI discovered the defects shortly after beginning a post-bid structural review does not transform an otherwise general disclaimer into a disclaimer sufficient to overcome the implied warranty.

The Board also did not render the disclaimer meaningless. For example, "canopy door details ... must be verified by the contractor" can reasonably mean that the contractor should check the physical details (e.g., door weight or dimensions) without altering the actual design. Indeed, the disclaimer requires that the contractor check door *details*, not door *design*. The Army certainly could have drafted a contract and specifications that shifted the risk of design defects, but the disclaimer on drawing S13 simply is not specific enough to shift such risk to Edsall. Thus, Edsall bore the risk to check the accuracy of the physical details but not the design.

Alternatively, the Army argues that the disclaimer, if ambiguous, was patently ambiguous. Thus, according to the Army, Edsall had an obligation to seek clarification before bidding. This case presents a very different scenario from cases in which this court or its predecessor have denied a

contractor recovery due to failure to investigate patent ambiguities. For example, in *Beacon Construction Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501 (1963), the contract involved facial inconsistencies between the specification and the drawings. One part of the specification called for weather-stripping only for doors while another part of the specification, as well as the drawings, required weather-stripping for windows also. *Id.* at 503. Article 2 in the *Beacon* contract further required that the contractor "immediately" notify the contracting officer of any discrepancies in the drawings or specifications or bear the "risk and expense" of any failure to do so. *Id.* at 504. The Court of Claims held that the contractor was under an affirmative duty to inquire about such glaring ambiguities. *Id.* ("We do not mean to rule that, under such contract provisions, the contractor must at his peril remove any possible ambiguity prior to bidding; what we do hold is that, when he is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government's representative if he intends to bridge the crevasse in his own favor.") This case, however, does not deal with glaring ambiguities or inconsistencies. Rather, the design flaw was hidden. Edsall had no obligation to ferret out the subtle flaw before bidding. *See Blount Bros.,* 346 F.2d at 973 ("In the case before us the ambiguity was subtle, not blatant; the contractor was genuinely misled and not deliberately seeking to profit from a recognized error by the Government.").

In sum, the disclaimer places the responsibility of verifying physical details, such as door size or the number of brackets needed, on Edsall, but it does not obligate Edsall to analyze the Government's design to determine whether it will work for its intended purpose. The Board correctly held that the disclaimer on drawing S13 did not shift the risk of a design flaw in the canopy doors to Edsall. Edsall is entitled to recover any additional costs reasonably incurred to produce a workable tilt-up canopy door.

## CONCLUSION

Because the Board correctly held that the general disclaimer on drawing S13 did not shift the risk of a design flaw in the canopy doors to Edsall, this court affirms.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*