DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Patricia I. Romero, Inc. dba Pacific West Builders | ) ASBCA No. 62627 |
| | ) |
| Under Contract No. N62473-l l-D-0065 | ) |

APPEARANCE FOR THE APPELLANT:     David A. Rose, Esq.
                                                              Rose Consulting Law Firm
                                                              Valdosta, GA

APPEARANCES FOR THE GOVERNMENT:     Craig D. Jensen, Esq.
                                                                          Navy Chief Trial Attorney
                                                                       Jerry Kim, Esq.
                                                                          Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE EYESTER
ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Patricia I. Romero, Inc. doing business as Pacific West Builders (PWB) appeals the partial denial of its claim for compensation related to the abatement of asbestos, and demolition and replacement of corridor walls at a building located on Marine Corps Base Camp Pendleton, California. The Department of the Navy (Navy or government) filed a summary judgment motion asserting that PWB cannot establish entitlement for its claim that the asbestos was unforeseen or the result of defective specifications or its claim for compensable delay. For the reasons set forth below, we grant the motion in part and deny the remainder.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

*Contract and Task Order*

On September 22, 2011, Naval Facilities Engineering Systems Command Southwest (NAVFAC SW) awarded indefinite delivery, indefinite quantity (IDIQ) multiple award construction contract (MACC) No. N62473-11-D-0065 to PWB (R4, tab 1 at 1-2). The contract was for new construction and renovation of various facilities located in the NAVFAC SW area of responsibility which included California (*id.* at 1). As relevant to this motion, the contract incorporated by reference Federal Acquisition Regulation (FAR) 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) and

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

explained that all task orders were subject to the terms and conditions of the contract (*id.* at 26, 105).

In July of 2014, NAVFAC SW issued a request for proposals to all MACC awardees for the design-build repair of the 13,245 square foot Battalion Building 53423 (Building 53423) at Marine Corps Base Camp Pendleton (gov't ex. 1 at 21-23, 26). Offerors were required to submit a fixed-priced proposal for all labor, equipment, and materials to accomplish the work (R4, tab 6 at 135).

The RFP's overall project description explained that the contractor was to, among many other things, "remove and dispose of all existing hazmat materials prior to construction" including asbestos removal, abatement, and clean-up as necessary; replace or repaint "[a]ll ceiling, wall, base and floor surfaces;" "[r]eplace interior non-load bearing partition walls;" and "remove the walls as needed to reconfigure the spaces" noting that if additional walls needed to be removed during construction, it would be handled as a modification (R4, tab 6 at 321-22).  With respect to hazardous materials, there was a pre-award request for information (RFI), RFI 20, seeking a hazardous materials report for the building.  In response, the agency stated:

> A:  Unfortunately[,] we do not have a Hazardous Materials report for Building 53423.  However, based on recent projects in buildings built at the same time and from similar plans, we assume the following:
>
> • At a minimum asbestos is present in the roof mastic, window caulking and hot-water piping insulation elbows, and will need to be abated. . . . *Most of the vinyl floor tile has been replaced recently enough that it should not contain asbestos, but there may be traces of old asbestos mastic remaining underneath, and there may be small amounts of the original asbestos tiles under the wall framing where interior walls are being demolished.*
>
> • At a minimum lead based paint is present on painted metal window frames, door frames and handrails, and will need to be abated if disturbed. . .
>
> *These items should be assumed to be present, and base bids should include costs for Lead and Asbestos surveys, and the abatement of the items listed above.  Additional materials that are discovered during surveying will be*

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> *considered unforeseen and handled with a contract
> modification.*

(*Id.* at 149) (emphasis added)  The Navy incorporated this RFI and response into the
RFP via amendment 01 (*id.* at 145).

On September 11, 2014, NAVFAC SW awarded PWB a fixed-priced task order
in the amount of $4,334,343 for the renovation of Building 53423 (R4, tab 9 at 1306).
According to the task order, the government accepted PWB's technical and price
proposals dated August 21, 2014, to complete the work in accordance with the RFP, as
amended (*id.* at 1319).  The completion date of the project was March 19, 2016, 555
calendar days from the date of award (R4, tab 13 at 1462).

*Asbestos Surveys*

Prior to construction, on April 24, 2015, PWB issued its final submittal basis of
design report prepared in coordination with its designer of record (R4, tab 26
at 1479-80).  PWB's design report included a consultant's Asbestos & Lead Paint
Survey Report dated January 7, 2015 (*id.* at 1861, 1863-64).  The consultant bulk
sampled 12"x12" and 9"x9" assorted color floor tiles and associated floor mastic in
composite form throughout the first and second floors.  The analyses indicated
asbestos in the brown 9"x9" floor tiles and associated floor mastic, which was
classified by regulation as non-friable[1] asbestos containing material (ACM).  As the
building was occupied and the floors covered with carpet, the report estimated that
about 3,000 square feet of this ACM needed to be removed by a licensed asbestos
abatement contractor prior to demolition.  (*Id.* at 1863)

PWB requested further asbestos testing, which was conducted on January 29,
2015.  The same consultant collected samples of additional items including 12"x12"
black vinyl floor tiles in the corridors.  (R4, tab 26 at 1873)  The test did not show
asbestos in this floor tile (*see id.*).

PWB submitted an RFI on May 5, 2015, stating that ACM was present in
approximately 3,000 square feet of mastic, as well as an unknown amount in floor
tiles, and in an amount far exceeding "trace."  PWB further stated the consultant
surveyed non-obvious locations and edges of the vinyl floor but did not perform
destruction testing.  Further, as vinyl tile had been replaced recently, PWB asked the
government whether there was an accurate estimate of ACM performed at that time.
PWB recommended further analysis to accurately quantify the amount of ACM, which

---

[1] Based on the record, we define "friable" as the ability to release airborne fibers
(gov't ex. 8 at 2).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

would involve chipping away small areas of vinyl tile to expose the material underneath. On May 11, 2015, the government construction manager agreed that PWB should perform the necessary testing to confirm whether there was asbestos in excess of the RFP language using selective destructive testing. (R4, tab 27)

A May 15, 2015 consultant report set forth the findings of the additional asbestos sampling performed. The consultant sampled various size and color floor tiles and mastic on the first and second floors of the building and noted that "[t]he main concern of this survey episode [was] to determine the asbestos content of the multi-layer floor tiles throughout the common areas and individual rooms of the building" because the original floors were recovered with different tiles over the years. (Gov't ex. 2 at 1) The report found the presence of asbestos fibers in the samples collected from the 9"x9" floor tiles of assorted colors and the black floor mastic throughout the entire first and second floors but stated these were classified by regulation as non-friable. The report presumed a quantity of approximately 12,000 square feet of the asbestos containing floor tiles in the common areas and the offices and 12,000 square feet of black floor mastic materials (under the floor tiles and adhered to the concrete). The recommendation was removal of the floor tiles and floor mastic by a licensed asbestos abatement contractor prior to demolition activities. (*Id.* at 2)

*Modifications and Requests for Modifications*

A few weeks later, PWB submitted a design change request memorandum dated June 2, 2015, for office wall demolition and replacement. The request asserted that asbestos was likely to be present underneath 19 office separation walls which were to remain, and therefore the removal of the 19 walls would facilitate overall ACM removal. (Gov't ex. 4 at 1)

On June 16, 2015, PWB submitted a design change request memorandum for asbestos floor tile and mastic, stating that the answer to RFI 20 regarding trace amounts of asbestos was incorrect. The stated reason for the change was that "[a]sbestos floor products can conclusively be presumed to be present in all corridors and offices" and must be removed prior to the renovation of the building. The request included removal of approximately 12,000 square feet of ACM tile and mastic. (Gov't ex. 3 at 1, 3)

On October 16, 2015, the parties executed bilateral Modification No. 03 to the task order pursuant to FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) (R4, tab 33). In the modification, the parties agreed that PWB would abate approximately 12,000 square feet of ACM (flooring tile and mastic). The modification incorporated by reference the April 24, 2015 final design, increased the total task order

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

price by $118,547, and extended the completion date by 142 calendar days (14 of them compensable) to August 8, 2016.  (R4, tab 33 at 2171)

The parties also executed Modification No. 04 with an effective date of November 3, 2015 (R4, tab 34 at 2174).  This modification increased the total task order price by $19,913 for the "selective demolition of interior walls to facilitate proper abatement of asbestos floor tiles as part of Building 53423 renovation efforts as per [PWB] proposal submitted on June 3, 2015."  The task order completion date remained unchanged.  (*Id.* at 2176)

At some point after construction began, an issue arose which is at the heart of this appeal concerning the corridor walls and asbestos abatement.  In this regard, on March 30, 2016, PWB submitted a cost proposal for its proposed change to demolish and replace the corridor walls in the amount of $163,234, noting that if the negotiation and approval went beyond a certain date, it would add $941.43 for each additional day.  PWB stated it discovered asbestos containing floor tile and mastic underneath the concrete mop curbs[2] in the corridors.  (R4 tab 63.2 at 2529)  The next day, PWB informed the government that effective April 4, 2016, it would suspend operations at the project and could not maintain its critical path as the corridor walls were required in order to install heating trunk lines (*id.* at 2532).

In addition, on that same day, PWB submitted a revised time impact analysis with a narrative seeking a 37-day extension of the task order completion date (R4, tab 63.2 at 2534; gov't ex. 6 at 1-2).  On the analysis, PWB indicated its current schedule of the project was 102 days behind but noted it had submitted a recovery schedule resolving 65 days and leaving PWB behind only 37 days (gov't ex. 6 at 2).  In response, on April 4, 2016, the government construction manager told PWB to submit a FRAGNET for the "asbestos unforeseen" to try and include it in a modification and include all related work and impact to successor activities in the critical path model (R4, tab 63.2 at 2534).

On May 19, 2016, PWB informed the government that the effect of the proposed modification on the task order completion date was 31 calendar days during construction related to the corridor wall activities and 30 calendar days related to standby through April 29, 2016, and then additional days after that time (R4, tab 63.2 at 2551).  By June 8, 2016, the government had the funds for the asbestos removal and corridor wall repair replacement (*id.* at 2542, 2553).

---

[2] According to PWB, a mop curb is typically "planted on the face of the wall" and looks "like [a] concrete baseboard."  App. resp. ex. 1, aff. of PWB Pres. ¶¶ 6-7, 13.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Months later, on September 2, 2016, the government asked PWB questions relating to asbestos removal and removal and replacement of the corridor walls (R4, tab 63.2 at 2559-60). On October 27, 2016, PWB's consultant stated PWB should isolate and contain the areas surrounding the newly discovered asbestos containing strips, stop construction activities in the area to avoid disturbing the strips, and perform abatement work (*id.* at 2565).

On October 31, 2016, the contracting officer informed PWB it would not proceed with the recommended change to demolish and replace the four non-load bearing walls (R4, tab 63.2 at 2567-68). According to a Navy structural engineer, the current status of the non-load bearing walls did not pose a safety risk to the building's inhabitants (R4, tab 48 at 2237). The contracting officer instructed PWB to proceed with the remaining items on the task order and stated the schedules submitted after April 2016 were noncompliant (*id.* at 2237-38).

On November 3, 2016, the Marine Corps Base Camp Pendleton Asbestos Program Manager conducted a site visit and observed the interior partitions, noting that the concrete curbs "were built against the footers and drywall in lieu of baseboards" and the partitions were built "over existing 9"x9" and 12"x12" [vinyl composition tile (VCT)]/mastic that tested positive for asbestos" and further that "the VCT found under the footer was an 'unforeseen'" (gov't ex. 8 at 1-2). The program manager noted that some of the steel studs and footers were corroded and would require replacement and that PWB's stance was to demolish the interior partitions, abate the remaining VCT and rebuild the interior studs because PWB could not "tell how far the corrosion extends without disturbing the VCT/mastic." The program manager noted that "any additional funding from NAVFAC is difficult and that [Facilities Engineering and Acquisition Division] would prefer to leave as much of the interior partitioning in place as possible, with abatement taking place during demolition or future renovation." The program manager noted that no regulation required abatement, but he would "prefer" asbestos be removed if there was available funding. (Gov't ex. 8 at 1)

In addition, the program manager advised the Camp Pendleton construction manager that as long as the tile/mastic remained under the footer and not disturbed it is non-friable but if it is disturbed the asbestos becomes friable and a concern. Further, as some of the studs and footers were corroded and needed to be replaced, the VCT would likely be disturbed during normal construction which would trigger regulatory requirements and mandate abatement (disturb means grinding, chipping, drilling, use of power tools). Again, the program manager recommended abatement if the funding was available as it was "much safer than trying NOT to disturb the asbestos" and "spot" abatement to fix the problem footers and studs was equal to the effort and expense of abating it all. (Gov't ex. 8 at 2)

6

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Starting October 31, 2016, PWB's President began emailing the contracting officer with detailed concerns about the ACM, namely that asbestos abatement was required since PWB discovered more asbestos containing tile, previously not known to have existed, when it cut new door openings into the corridor wall (R4, tab 49 at 2239-40). PWB explained that as the remaining construction work such as installing door frames, thresholds, and new flooring would likely disturb the asbestos and cause it to become friable, the environmental consultant recommended removal (*id.* at 2239). PWB further stated that it needed to remove the concrete curb, which required removing the corridor wall due to the improper way the concrete curb was installed (it encased the wall framing in the concrete) (*id.* at 2239, 2242). PWB stated it was not aware the concrete mop curb was installed after the corridor wall was constructed and on top of the existing vinyl asbestos flooring (*id.* at 2239).

On November 16, 2016, PWB submitted an RFI concerning the demolition of the corridor wall and mop curb for the vinyl asbestos tile and mastic abatement underneath the curb (R4, tabs 50, 50.1). In response, the government stated it did not direct PWB to demolish the walls or abate the asbestos and therefore the government canceled the demolition on October 31, 2016 (R4, tab 52.1). PWB's President resubmitted the RFI on November 17, 2016, stating again that the need for abatement of asbestos under the mop curbs, which runs the length of the corridor walls, was required (R4, tab 52 at 2254). Days later, on November 21, 2016, PWB informed the government that it would proceed with the abatement and demolition and replacement of the corridor walls and that as the work was not within the scope of the task order, it would submit a request for equitable adjustment (REA). (R4, Tab 63.2 at 2580-81)

*The REA and Claim*

On March 2, 2017, PWB submitted its REA seeking $410,997.64 for the abatement, demolition, and replacement of the corridor walls (R4, tab 59.1). The amount was broken into the following cost items: abatement and demolition costs; framing and drywall costs; working general conditions costs; standby general conditions costs; daily general conditions costs; and attorney's fees (*id.* at 2282-83). The government did not respond to the REA, and on January 26, 2018, PWB submitted a certified claim for $411,472.64 to the contracting officer (R4, tabs 63, 63.1, 63.2).

The government issued bilateral Modification No. 07 on September 12, 2019, which partially settled the claim for $106,421 (R4, tab 64 at 2620, 2622). The modification addressed abatement and demolition work, framing and drywall costs, and PWB's overhead (*id.* at 2622). PWB retracted its claimed costs for daily general conditions during settlement negotiations (R4, tab 65 at 2628).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

On May 7, 2020, the contracting officer issued a final decision on the remaining portions of the claim and concluded that PWB was not entitled to any compensable delays related to working general conditions because the government did not direct performance of the work. The contracting officer found partial entitlement for standby general conditions, acknowledging 95 days of compensable delay for a total amount of $80,374.75 and a time extension for 197 days claimed. However, the contracting officer concluded that 102 days were not compensable since PWB's March 2016 time impact analysis showed it was 102 days behind schedule. (R4, tab 65 at 2628-29) The final decision found entitlement to the attorney's fees for preparation of the REA and explained that the government issued Modification No. 07 because it received a benefit for the abatement and the replaced walls but maintained that the abatement was not required (*id.*).

PWB appealed the final decision to the Board on August 4, 2020. After that, the government issued unilateral task order Modification No. 09 which, pursuant to the findings of the final decision, increased the total price by $85,287.25, and extended the task order completion date by 197 days, from August 8, 2016 to February 21, 2017, finding 102 days were non-compensable and 95 were compensable (gov't ex. 13 at 1-2).

## DECISION

In its complaint, PWB argues it relied on government specifications and directions regarding the amount of ACM that could be present inside Building 53423 (compl. at 5). PWB argues it discovered additional ACM under the concrete mop curb and was therefore delayed and suffered additional costs due to an unforeseen site condition, or in the alternative defective specifications, and the failure of the Navy to quickly address the issue (*id.* at 4-5). Accordingly, PWB contends it is entitled to working general conditions and standby general conditions costs (*see id.* at 3, 5). The Navy has moved for summary judgment seeking dismissal of the entire appeal. Specifically, the Navy has set forth three arguments countering PWB's working general conditions claim that the asbestos was unforeseen or the result of defective specifications, and one argument countering the claim for standby costs (gov't mot. at 19-26).

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*Working General Conditions Claim*

     *Type I Differing Site Condition*

     As noted, PWB contends the asbestos under the mop curb was an unforeseeable condition (compl. at 4).  The Navy has moved for summary judgment arguing that PWB cannot meet the test for a Type I differing site condition because the asbestos under the mop curb was foreseeable (gov't mot. at 22-24).

     The governing clause, FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984), explains that there are two types of differing site conditions: (1) "[s]ubsurface or latent physical conditions at the site which differ materially from those indicated in this contract" (Type 1); or (2) "[u]nknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract" (Type 2).  (R4, tab 1 at 26, 105; FAR 52.236-2(a)).  PWB must prove the following for a Type 1 differing site condition:

> (1)  the condition indicated in the contract differs materially from those actually encountered during performance; (2)  the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; (3)  the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and (4)  the contractor was damaged as a result of the material variation between expected and encountered conditions.

*Comtrol, Inc. v United* States, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (citation omitted); *Optimum Servs., Inc*., ASBCA No. 58755, 15-1 BCA ¶ 35,939 at 175,653 (citing *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987)).

     The Navy argues that asbestos containing floor tile and mastic under the mop curb of the corridor walls was foreseeable because RFI 20 stated there could be small amounts of ACM under the interior wall frames to be demolished (gov't mot. at 22-23). The Navy asserts that interior walls include corridor walls and relies on PWB's request for a design change as support, whereby PWB states that asbestos floor products could conclusively be presumed present in all corridors and offices (*id.* at 23 (citing gov't ex. 3 at 1)).  Further, the Navy argues that the ACM was foreseeable because PWB's design called for cutting new doors in the corridor walls, its own consultants' reports

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

and surveys showed there was ACM present in the floor tiles, and PWB sought to abate approximately 12,000 square feet of the building based on these reports (*id.* at 23-24).[3]

According to PWB, the ACM was not foreseeable because the concrete mop curb was not part of the original construction as believed and constructed unconventionally by pouring the concrete into the cavity of the wall encapsulating the wall framing member (app. resp. at 4; ex. 1, aff. of PWB Pres. at ¶ 6).[4] Further, PWB argues the following distinctions between corridor and interior walls: corridor walls run the length of the building and have mop curbs while interior walls divide the open spaces on either side of the corridor into smaller rooms and do not have mop curbs; and corridor walls, unlike interior walls, are placed at the time of construction with the frame and do not sit on top of flooring (app. resp. at 1-2, 4; ex. 1, aff. of PWB Pres. at ¶¶ 4, 5). Therefore, PWB argues there was no reason to suspect floor tile or mastic would be *under* the mop curb of the corridor walls or that the mop curbs had been installed such that it laid on top

---

[3] The Navy assumes PWB is arguing a Type 1 differing site condition (gov't mot. at 22). We note that with respect to a Type 2 differing site condition the contractor must prove the recognized and usual conditions at the site, the actual physical conditions encountered and that they differed from the recognized and usual, and that the different conditions caused an increase in the cost of contract performance. *Charles T. Parker Constr. Co. v. United States*, 433 F.2d 771, 778 (Ct. Cl. 1970); *Costello Indus., Inc.*, ASBCA No. 49125, 00-2 BCA ¶ 31,098 at 153,585. Here, the Navy relies on PWB's consultant's surveys conducted *after* award arguing these reports show asbestos in the floor tile and mastic (gov't mot. at 23). PWB argues that even considering these reports, there was no reason to suspect asbestos under the mop curb because the site condition (mop curb) differed materially from the usual as it was constructed unconventionally (sits on top of tile) (app. resp. at 4, 11; ex. 1, aff. of PWB Pres. at ¶ 6). Accordingly, the Navy should not assume PWB is arguing that the conditions it encountered only constituted a Type 1 differing site condition.

[4] The Navy argues that we should not rely on the affidavit from PWB's President because it contains conclusory assertions with no citations to the record and no explanation of the President's personal knowledge on the matter (gov't reply at 2). The Board may look to the Federal Rule of Civil Procedure for guidance, and in this context, we note that FED. R. CIV. P. 56(c)(4) provides that an affidavit or declaration used in support of a motion must be made on personal knowledge, set out facts admissible in evidence, and show that the affiant or declarant is competent to testify on the matter. Here, the record shows that PWB's President emailed the government several times regarding this issue during performance of the task order. In addition, the affidavit, when read in conjunction with PWB's brief, responds directly to the Navy's statement of facts which cite to the record.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

of the asbestos containing flooring until the corridor walls were cut to install doors (app. resp. at 4-5, 11-12; ex. 1, aff. of PWB Pres. ¶¶ 6, 8).

There are material facts in dispute as to whether ACM under the mob curb was foreseeable based on the information available to PWB at the time it submitted its offer on the task order. In this regard, RFI 20 stated that "[m]ost of the vinyl floor tile has been replaced recently enough that it should not contain asbestos, but there may be traces of old asbestos mastic remaining underneath" and that "there may be small amounts of the original asbestos tiles under the wall framing where interior walls are being demolished." (R4, tab 6 at 149) Further, PWB's request for a design change stated that asbestos floor products could conclusively be presumed present in all corridors and offices (gov't mot. at 23 (citing gov't ex. 3 at 1)). These documents do not specifically state that ACM could be found under the mop curbs of the corridor walls. Therefore, based on the record to date, it is unclear whether asbestos under the mob curb was foreseeable.

*Deviation from Design*

The Navy also argues it was PWB's decision to deviate from its design and remove and replace the corridor walls (and therefore abate the asbestos) despite the "government's clear rejection of this proposed change" (gov't mot. at 24). The Navy argues that neither of PWB's consultants specifically recommended removal of the walls (*id.* at 24-25).

PWB argues that it was required to abate the asbestos so as not to expose its employees to a hazardous workplace (app. resp. at 12-13). PWB contends the ACM under the concrete mop curb could have become friable if disturbed during construction and therefore removal and replacement of the corridor walls was required to remove the ACM (app. resp. at 4-5; ex. 1, aff. of PWB Pres. ¶¶ 14, 18). PWB argues it hired the second consultant to see if it could encapsulate the tile and asbestos to avoid removing it at the mop curb but since encapsulation required all 6 sides be encapsulated (top, bottom and four sides), the only solution was abatement (app. resp. at 5; ex. 1, aff. of PWB Pres. ¶ 14). According to PWB, the whole corridor wall had to be removed to abate the asbestos under the mob curb (app. resp. at ex. 1, aff. of PWB Pres. ¶ 13).

We conclude that again there are material facts in dispute. For example, there is a dispute as to whether for the health and safety of the workers and others PWB was required to abate the ACM and remove the corridor walls because it could become friable during construction activities. In this regard, the government's own program manager noted that if disturbed, the asbestos becomes friable and a concern and that it

11

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

was much safer to abate the asbestos than trying not to disturb it and spot fix the problem (gov't ex. 8 at 2).

*Spearin Doctrine Applicability*

In its complaint, PWB argues that the specifications were defective for failing to include the asbestos threat in the corridor walls (compl. at 4). The Navy argues that the *Spearin* doctrine does not apply to this claim issue (gov't mot. at 25-26). According to this doctrine, "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *United States v. Spearin*, 248 U.S. 132, 136 (1918). The implied warranty that the government's specifications are free from design defects attaches only to design specifications. *White v. Edsall Constr. Co.*, 296 F.3d 1081, 1084 (Fed. Cir. 2002).

The Navy contends that PWB relies on Amendment 01 to the RFP (incorporated by reference into the task order) as the misleading specification, but that amendment is not a design specification in which an implied warranty would apply (gov't mot. at 25). In response, PWB contends that when the contracting officer directed PWB and its employees return and perform the work described in the task order, without removing the walls which PWB had determined created a hazardous situation, the government decided the means and method by which PWB would perform the work and to its design (app. resp. at 13). PWB, however, did not comply with the government's direction.

It is important to note that the implied warranty that the government's specifications are free from defects only applies to contractors that comply with the plans and specifications. *Al Johnson Constr. Co. v. United States*, 854 F.2d 467, 469 (Fed. Cir. 1988). In other words, the burden is on PWB to prove that it complied substantially with the plans and specifications and that despite compliance, defective work resulted. *Maecon, Inc.*, ASBCA No. 31081, 89-2 BCA ¶ 21,855 at 109,945. Here, PWB has not argued that Amendment 01 and RFI 20 were defective specifications but instead that the government's direction to retain the corridor walls was the defective specification. Even assuming that the *Spearin* doctrine applies to a contracting officer's direction as PWB contends (which we do not decide here), we would rule against PWB: as PWB did not comply with the government's direction, the *Spearin* doctrine cannot apply and we grant the government's motion regarding PWB's claim that the specifications were defective. Although we agree with the government on this point, we note that PWB has other bases for its working general conditions claim.

12

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*Standby Claim*

Finally, the Navy has moved for summary judgment on the claim for standby costs arguing that PWB cannot prove entitlement for more than the 95 days of compensable delay already granted (gov't mot. at 19-20). "To prove [entitlement for a] compensable delay, appellant must show that the government was responsible for specific delays; overall project completion was delayed as a result; and any government-caused delays were not concurrent with delays within appellant's control." *Versar, Inc.*, ASBCA No. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,128.

The Navy argues the government was not solely responsible for the specific delays and relies on PWB's March 31, 2016 time impact analysis in which PWB allegedly reveals there were sources of delay occurring during the design period (gov't mot. at 20-21). The Navy contends PWB never presented any alleged government causes of delay during the design period in its claim as excusable bases for time extensions and, in addition, PWB never presented any analysis in its claim or its responses to the Navy's discovery requests that evidences a clear apportionment of delay to each party (*id.* at 21). In sum, the government argues "there is no genuine issue of material fact that Appellant would not have completed the project by the [task order] completion date of August 8, 2016 when it submitted its design change request to remove and replace the corridor walls." (*Id.* at 21). In its reply brief, the Navy also asserts that PWB cites nothing to support an assumption that the contracting officer was going to issue the corridor wall modification and that PWB concedes the task order would not have met the stated completion date (gov't reply at 4-5).

In response, PWB states that the referenced time impact analysis does not show that PWB was 102 behind but instead shows that PWB was to re-sequence work to reduce the delay to 37 days (app. resp. at 2, 10). According to PWB, the 37-day delay was to have been added to the proposed corridor wall modification and had the modification been issued, there would have been no delay (app. resp. at 10). PWB therefore contends the government's response time of six months regarding the asbestos found under the corridor walls and mop curbs caused the delay (app. resp. at 10; ex. 1, aff. of PWB Pres. ¶¶ 16-17). PWB contends the government led it to believe, from March 2016 through September 2016, that it would be given a change order for the demolition and abatement of the corridor walls which would include compensable time and costs (app. resp. at 10; ex. 1, aff. of PWB Pres. ¶ 17). PWB relies on the April 4, 2016 email where the Navy construction manager told PWB to submit a FRAGNET for the "asbestos unforeseen" to try and include it in a modification (app. resp. at 10; R4, tab 63.2 at 2534).

At first blush it appears the 37 days of delay do not relate to the ACM under the mop curb. However, we note that PWB submitted a cost proposal to demolish and

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

replace the corridor walls and the next day submitted a revised time impact analysis seeking a 37-day extension of the task order completion date.  In its reply brief, the Navy asserts that the 37 days of delay were due to work performed pursuant to Modification Nos. 03 and 04.  The Navy also briefly asserts for the first time that these bilateral modifications "contain [an] accord and satisfaction and release language for future claims of delays contemplated by the [time impact analysis]."  (Gov't reply at 5-6)

The Navy's assertions are not grounds for summary judgment.  In this regard, the matter was insufficiently briefed and there are disputed facts concerning the time impact analysis.  Specifically, there is little in the record explaining this time impact analysis, the number of days of delay, and whether any government-caused delays were concurrent with delays within PWB's control.

## CONCLUSION

For the foregoing reasons, we deny the government's motion for summary judgment in part and grant it in part.  Specifically, we grant the government's motion for summary judgment only on the matter regarding PWB's claim for defective specifications.  The remainder is denied.

Dated:  February 13, 2024

LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62627, Appeal of Patricia I. Romero, Inc. dba Pacific West Builders, rendered in conformance with the Board's Charter.

Dated:  February 13, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals